The Honorable Ricardo S. Martinez

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

SECTRA COMMUNICATIONS AB and COLUMBITECH, INC.,

Plaintiffs,

v.

ABSOLUTE SOFTWARE, INC. and MOBILE SONIC, INC.,

Defendants.

Case No. 2:22-cv-00353-RSM

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT AND INVALIDITY ON PLAINTIFFS' PATENT INFRINGEMENT CLAIM (COUNT 1)**

**NOTE ON MOTION CALENDAR: AUGUST 30, 2024**

**ORAL ARGUMENT REQUESTED**



COOLEY LLP
1700 SEVENTH AVE., SUITE 1900
SEATTLE, WA 98101
(206) 452-8700

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION .......... 1
II. LEGAL STANDARDS .......... 2
A. Non-Infringement .......... 2
B. Invalidity – Lack of Adequate Written Description .......... 2
III. THE ’437 PATENT .......... 3
IV. ARGUMENT .......... 5
A. Summary Judgment of Non-Infringement of the Asserted Claims .......... 5
1. Plaintiffs have no evidence of the claimed “traffic…are directed by traffic.” .......... 5
2. Plaintiffs have no evidence of the claimed “second unit.” .......... 8
3. Plaintiffs have no evidence that the accused products “provid[e] said [first/second] unit with a [first/second] session layer which is adapted to act as an interface between said [first/second] protocol stack and said [first/second] software components….” .......... 13
B. Summary Judgment of Invalidity for Lack of Written Description .......... 17
V. CONCLUSION .......... 24

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
598 F.3d 1336 (Fed. Cir. 2010) (en banc)....3, 19, 20, 23

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)....2, 5, 8

*Chef Am., Inc. V. Lamb-Weston, Inc.*,
358 F.3d 1371 (Fed. Cir. 2004)....8

*Cordis Corp. v. Boston Sci. Corp.*,
658 F.3d 1347 (Fed. Cir. 2011)....8

*Driessen v. Sony Music Entertainment*,
640 F. App'x 892 (Fed. Cir. 2016)....23

*Flexuspine, Inc. v. Globus Med., Inc.*,
879 F.3d 1369 (Fed. Cir. 2018)....2

*Freedman Seating Co. v. Am. Seating Co.*,
420 F.3d 1350 (Fed. Cir. 2005)....2

*Liquid Dynamics Corp. v. Vaughan Co., Inc.*,
449 F.3d 1209 (Fed. Cir. 2006)....8

*LizardTech, Inc. v. Earth Res. Mapping, Inc.*,
424 F.3d 1336 (Fed. Cir. 2005)....3, 19, 20, 24

*Lockwood v. Am. Airlines, Inc.*,
107 F.3d 1565 (Fed. Cir. 1997)....3, 23

*Medtronic, Inc. v. Mirowski Family Ventures, LLC*,
571 U.S. 191 (2014)....5

*Novartis Corp. v. Ben Venue Labs., Inc.*,
271 F.3d 1043 (Fed. Cir. 2001)....2

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008)....2, 5, 15

*PowerOasis, Inc. v. T–Mobile USA, Inc.*,
522 F.3d 1299 (Fed. Cir. 2008)....2

## TABLE OF AUTHORITIES
**continued**

**Page(s)**

*Trading Techs. Int'l, Inc. v. eSpeed, Inc.*,
595 F.3d 1340 (Fed. Cir. 2010)....................2

*Treehouse Avatar LLC v. Valve Corp.*,
54 F.4th 709 (Fed. Cir. 2022) ....................2, 8

*Tronzo v. Biomet, Inc.*,
156 F.3d 1154 (Fed. Cir. 1998)....................20, 22, 24

**Statutes**

35 U.S.C. § 112....................2, 3



COOLEY LLP
1700 SEVENTH AVE., SUITE 1900
SEATTLE, WA 98101
(206) 452-8700

## I. INTRODUCTION

Defendants are entitled to summary judgment on Sectra's claim for infringement of the '437 patent (Count 1) because Sectra cannot meet its burden of proof on infringement and because the '437 patent is invalid for lack of written description.

To prove infringement, Sectra must show infringement by a preponderance of the evidence for every limitation of Claim 1—the sole independent claim in the asserted '437 patent. But Sectra's infringement expert, Dr. Shoemake, applied materially incorrect constructions for multiple claim limitations, including completely disregarding the Court's guidance on "traffic…are directed by traffic." Dr. Shoemake provides no evidence that any traffic in the NetMotion Accused Product is ever directed by traffic, no evidence of any alleged second unit that includes all required elements for the claimed second unit, and no evidence that any alleged session layer acts as an interface between the alleged software components and protocol stack. As a result, Sectra has no evidence for infringement of multiple limitations of Claim 1, under the proper constructions.

Defendants are also entitled to summary judgment because the '437 patent is invalid. Sectra and its technical expert Dr. Shoemake assert that the '437 patent claims "a *novel* routing technique" involving a common session protocol used by the session layers on two communicating units. (*E.g.*, Ex. 1 (Shoemake Rebuttal Report) at ¶¶405, 503) (emphasis added). The '437 patent specification, however, fails to describe *any* session layer routing techniques for a session protocol, to say nothing of a novel one. The Asserted Claims are thus invalid for lack of written description regarding how to achieve the functional outcomes claimed in the "traffic" limitation 1[g].[1]

The Court should therefore enter summary judgment for Defendants on Count 1, alleged infringement of the '437 patent.

---

[1] Claim limitation 1[g] is present in all of the Asserted Claims, which include independent claim 1 and dependent claims that all depend, directly or indirectly, on claim 1.

## II. LEGAL STANDARDS

### A. Non-Infringement

"The [all-limitations] rule holds that an accused product or process is not infringing unless it contains each limitation of the claim, either literally or by an equivalent." *Freedman Seating Co. v. Am. Seating Co.*, 420 F.3d 1350, 1358 (Fed. Cir. 2005) (internal citation omitted). Compliance with the all-limitations rule is "a question of law." *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1355 (Fed. Cir. 2010). If there is a lack of evidence to show an accused product contains *all* of the limitations of the patent claims, the Defendants are entitled to summary judgment because the Plaintiffs bear the burden of demonstrating the existence of each limitation in the accused product. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Treehouse Avatar LLC v. Valve Corp.*, 54 F.4th 709, 715 (Fed. Cir. 2022) (granting summary judgment of noninfringement because plaintiff's infringement theory depended on expert testimony that was stricken for failing to apply the proper claim construction); *Novartis Corp. v. Ben Venue Labs., Inc.*, 271 F.3d 1043, 1046 (Fed. Cir. 2001) ("Summary judgment must be granted against a party who has failed to introduce evidence sufficient to establish the existence of an essential element of that party's case, on which the party will bear the burden of proof at trial."); *Flexuspine, Inc. v. Globus Med., Inc.*, 879 F.3d 1369, 1377 (Fed. Cir. 2018). The Court, and not the jury, is responsible for resolving the parties' dispute over the meaning and scope of the claim terms. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361-62 (Fed. Cir. 2008).

### B. Invalidity – Lack of Adequate Written Description

The specification of a patent as filed must "contain a written description of the invention." 35 U.S.C. § 112. "Compliance with the written description requirement is a question of fact but is amenable to summary judgment in cases where no reasonable fact finder could return a verdict for the nonmoving party." *PowerOasis, Inc. v. T–Mobile USA, Inc.*, 522 F.3d 1299, 1307 (Fed. Cir. 2008).

To satisfy the written description requirement: "the specification must describe an invention understandable to [a] skilled artisan and show that the inventor actually invented the invention claimed" based on "an objective inquiry into the four corners of the specification." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc). While often framed in terms of showing "possession" of the invention by the inventor, "'possession *as shown in the disclosure*' is a more complete formulation" of what is required. *Id.* (emphasis added). The written description requirement "is part of the *quid pro quo* of the patent grant and ensures that the public receives a meaningful disclosure in exchange for being excluded from practicing an invention for a period of time." *Id.* at 1354.

As part of this *quid pro quo*, the written description requirement ensures that when a patent claim uses broad, functional language to generically claim something by the results or outcomes it achieves, the specification must disclose sufficient methods or means to accomplish the claimed functions or achieve the claimed results. *See id.* at 1352; *see also LizardTech, Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336, 1344-46 (Fed. Cir. 2005).

Further, it is well-established that "[i]t is not sufficient for purposes of the written description requirement of § 112 that the disclosure, when combined with the knowledge in the art, would lead one to speculate as to modifications that the inventor might have envisioned, *but failed to disclose*." *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997) (emphasis added); *see also Novartis Pharms. Corp. v. Accord Healthcare, Inc.*, 38 F.4th 1013, 1016 (Fed. Cir. 2022) ("It is not enough that a claimed invention is 'an obvious variant of that which is disclosed in the specification.' Disclosure is essential." (quoting *Lockwood*, 107 F.3d at 1572)).

## III. THE '437 PATENT

Plaintiffs alleged that Defendants have infringed Claims 1, 2, 3, 4, 9, 10, 13, 14, 15, 22, and 23 of the '437 patent. Claim 1, the sole independent claim of the '437 patent, recites:

[Preamble] A method of maintaining communication between a first unit and a second unit,

[Preamble A] wherein said first unit is comprised of a geographically mobile unit and includes a first protocol stack adapted to act between a first communications hardware used for communication via a first communications network and one or more first software components, and

[Preamble B] wherein said second unit includes a second protocol stack adapted to act between a second communications hardware used for communication via a second communications network and one or more second software components,

the method comprising the steps of:

[C] providing said first unit with a first session layer which is adapted to act as an interface between said first protocol stack and said first software components;

[D] providing said second unit with a second session layer which is adapted to act as an interface between said second protocol stack and said second software components;

[E] causing said first session layer to indicate a first identity corresponding to said second unit and said second software components;

[F] causing said second session layer to indicate a second identity corresponding to said first unit and said first software components;

[G] causing said first and said second session layers to use a common session protocol to ensure that traffic belonging to different first sockets in said first software components are directed by traffic intended for said second software components to different second sockets in said second software components uniquely corresponding to said different first sockets, and that traffic belonging to different second sockets in said second software components are directed by traffic intended for said first software components to different first sockets in said first software components uniquely corresponding to said different second sockets;

[H] providing said first unit with one or more first communications hardware with associated drive routines adapted to different communications networks;

[I] in the event of said first unit switching from said first communications network to a third communications network, causing said first session layer to maintain said communication between said first unit and said second unit by selecting necessary

> first communications hardware and drive routines for said third communications network; and
>
> [J] causing said second session layer to retain said second identity during the switching of said first unit from said first communications network to said third communications network.

(Ex. 2 ('437 patent) at Claim 1) (Annotated). If Defendants do not infringe Claim 1, then Defendants do not infringe Asserted Claims 2-4, 9, 10, 13-15, 22, and 23 because they all depend on Claim 1.

## IV. ARGUMENT

### A. Summary Judgment of Non-Infringement of the Asserted Claims

Plaintiffs bear the burden of proving infringement. *Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 571 U.S. 191, 198-99 (2014). But Plaintiffs' evidence in this case falls far short. As an initial matter, for the reasons described in Defendants' concurrently filed motion to exclude the testimony of Dr. Shoemake, Dr. Shoemake's analysis for infringement of multiple claim limitations in the sole independent claim fail to apply proper claim constructions in his analysis of infringement.[2] If the Court excludes Dr. Shoemake's testimony as to these claim limitations, Defendants are entitled to summary judgment of non-infringement because Plaintiffs will not have evidence of infringement for every claim limitation, as required. Even if the Court permits Dr. Shoemake's testimony, Plaintiffs still have not put forward sufficient evidence to show infringement of multiple limitations, each of which is independent grounds for a judgment of non-infringement under *Celotex*. 477 U.S. at 322-323.

#### 1. Plaintiffs have no evidence of the claimed "traffic…are directed by traffic."

Plaintiffs have presented no evidence that the NetMotion Accused Product practices a method involving the "traffic" claim limitation. Plaintiffs' argument hinges entirely on Dr. Shoemake's new and improper claim construction of the "traffic" claim limitation. As explained

---

[2] To the extent this amounts to a dispute over claim scope between the parties, it falls to the Court to resolve that dispute as a matter of law. *See O2 Micro Int'l.*, 521 F.3d at 1361-62.

in Defendants' concurrently filed motion to exclude the testimony of Dr. Shoemake, rather than adhering to the Court's construction, Plaintiffs' expert essentially rewrote the claim to opine that the "traffic" limitation required "data traffic" to be "directed according to traffic ***type***", adding words that do not exist in the claim:

> Q: I want to clarify I think two things I heard in that. The first is, I believe in the middle you explained that directed by traffic means directed according to traffic type?
>
> A: I think that a person of ordinary skill in the art would look at this claim limitation as a whole. They would not decimate it to traffic directed by traffic because that loses – they would realize that loses the meaning of the claim limitation. They would realize that the claim limitation starts off by talking about traffic or data, data traffic, coming from different sockets. **And then when it talks about directing those and it says by traffic, it's talking about according to the traffic type.** It just said in the same limitation that there are different first sockets. These different first sockets such as e-mail, text messaging, web traffic are where the traffic, the data emerges from and **it's saying just like assigning boys and girls to basketball teams, I'm going to direct them to their basketball teams by height. It's not saying – it's not indicating by whom, it's saying I'm going to look at the different traffic types and that's how the directing is going to occur**.

(Ex. 3 (Shoemake June 18, 2024 Tr.) at 111:5 – 112:4) (emphasis added). Dr. Shoemake further opined that the claim limitation, despite its literal language, in his view is not about <u>who or what</u> directs the traffic at all; as Dr. Shoemake testified, the limitation "is not saying by – as in, for example, by whom." (*Id.* at 108:23-24).

Dr. Shoemake's construction is inconsistent with the Court's claim construction order, in which the Court set forth its understanding that the plain and ordinary meaning of the "traffic" limitation specifies "who" or "what" directs traffic—i.e., "traffic" directs other "traffic." The Court's claim construction order explained that the "traffic" limitation plainly encompasses how "the path taken by traffic between sockets directs subsequent traffic." Dkt. 194 at 10; (Ex. 4 (Shoemake Rep.) at 201 n. 54). In other words, the Court was clear that the "traffic" limitation addresses who or what directs traffic—"the path taken by traffic between sockets." Dkt. 194 at 10

By testifying that the claim limitation does not encompass "whom" directs traffic, Dr. Shoemake broadened the scope of his infringement analysis in a manner inconsistent with the Court's claim construction order.

Dr. Shoemake's explanation of "data traffic" being "directed according to traffic type" differs substantively from the Court's explanation of the plain and ordinary meaning of the claim limitation, and impermissibly adds words (i.e., "type") that do not exist in the claim. At deposition, Dr. Shoemake explained that his new, expanded view of directing traffic "according to the traffic type" was similar to organizing basketball teams:

> **So this by traffic means according to the traffic type.** This is not saying by – as in, for example, by whom. There's different meanings of the word by. You could say the dinner was cooked by Dr. Shoemake or you could say I organized the basketball teams. I **put the boys on the basketball team by height. By height meaning according to their height. And that's what we have here. We have the latter. We have traffic is being directed by traffic.**

(Ex. 3 at 108:22 – 109:6) (emphasis added). But organizing basketball players by height is distinct from the automobile metaphor the Court used to explain the plain meaning of the "traffic" limitation:

> To use an automobile metaphor: when you are driving around trying to find a popular concert venue, you might follow the traffic ahead of you to see where everyone is going, and that traffic "directs" where you go. You and the cars behind you are traffic, the cars in front of you are traffic too. **The traffic that successfully found the concert venue, in a sense, directs the subsequent traffic**, even though of course the cars are driven by steering wheels, connected to hands, connected to brains.

Dkt. 194 at 10 (emphasis added). Instead of traffic being directed by some attribute or "type" as argued by Shoemake, the Court's automobile metaphor explains what the plain meaning of the claim language requires—that the "traffic" limitation requires subsequent traffic to be directed by the path of other traffic that successfully reached the destination of the "subsequent traffic." Dkt. 194 at 10. This is the understanding that Plaintiff advocated at claim construction. Dkt. 163 at 18 ("the initial traffic between a first socket in the first software component and the corresponding

second socket in the second software component, establishes the route between the first socket and the second socket that the subsequent traffic will take, thereby directing that subsequent traffic from the first socket to the corresponding second socket."); Dkt. 172 at 13-14 ("a POSITA would have understood that the initial traffic (which includes the destination address) directs the subsequent traffic by establishing the route of the subsequent traffic.").

By now shifting positions and reinterpreting the traffic limitation as directing traffic "according to traffic type," Plaintiffs' infringement expert misapplies the Court's construction in a manner that would effectively rewrite the claim to broaden its scope. *See Chef Am., Inc. V. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004) ("we construe the claim as written, not as the patentees wish they had written it"); *Treehouse Avatar LLC,* 54 F.4th at 715 ("[T]he grant of a motion to strike expert testimony is not improper when such testimony is based on a claim construction that is materially different from the construction adopted by the parties and the court."); *Cordis Corp. v. Boston Sci. Corp.*, 658 F.3d 1347, 1357 (Fed. Cir. 2011) (expert testimony "based on an incorrect understanding of the claim construction" must be disregarded); *Liquid Dynamics Corp. v. Vaughan Co., Inc.*, 449 F.3d 1209, 1224 n. 2 (Fed. Cir. 2006) (affirming exclusion of expert opinion evidence that relied on an "impermissible claim construction" because it could confuse the jury). The Court has already provided its explanation of the claim term's plain meaning, and the parties are obligated to apply it. Dr. Shoemake has not done so. Because Plaintiffs' expert failed to apply the plain meaning of the "traffic" limitation, Plaintiffs' have neither admissible nor supporting evidence that the NetMotion accused product practices the "traffic" claim limitation as construed. Consequently, Plaintiffs cannot meet their burden of proving infringement and Defendants are entitled to a judgment of non-infringement under *Celotex*. 477 U.S. at 322-323.

**2. Plaintiffs have no evidence of the claimed "second unit."**

Defendants are also entitled to summary judgment of noninfringement because Plaintiffs have no evidence that the NetMotion Accused Product practices a method involving the claimed

"second unit." The plain meaning of the claims requires the "second unit" to include the "second protocol stack" and the "second software components."[3] As explained in Defendants' concurrently filed motion to exclude Dr. Shoemake's testimony, Dr. Shoemake admitted to applying his own construction of "second unit" that did not require the claimed "second software components" to be in the second unit despite the plain language of the claims.

Indeed, his broad new meaning of the term "second unit" is inconsistent with the claim language, inconsistent with the specification, and even Dr. Shoemake's own understanding of "first unit." The claim language of limitations 1[Preamble B] requires three elements of the "second unit"—communications hardware, software components, and a protocol stack that sits between them. As shown in the table below, this limitation exactly parallels the requirements of the "first unit" set forth in limitation 1[C]:

| First Unit | Second Unit |
|---|---|
| **Claim 1[Preamble A]** wherein said first unit is comprised of a geographically mobile unit and includes a first protocol stack adapted to act between a first communications hardware used for communication via a first communications network **and one or more first software components**, and | **Claim 1[Preamble B]** wherein said second unit includes a second protocol stack adapted to act between a second communications hardware used for communication via a second communications network **and one or more second software components** |

(Ex. 2 at Claim 1) (Annotation and emphasis added).

Even Dr. Shoemake acknowledges, in accord with the claim language, that the first unit includes the first software components. In his opening report, Dr. Shoemake explains that the first software components, in the context claim limitation 1[F], are "applications running on the first unit." (Ex. 4 at ¶521.) Dr. Shoemake reiterated this point in deposition explaining that the first unit includes the first software components, which he maps to the client applications:

[3] As discussed further in the subsection below, the claimed "second unit" also must include "a second session layer which is adapted to act as an interface between said second protocol stack and said second software components." (Ex. 2 at 13:58-61).

> With respect to the first unit, which you are asking about, every one of those components on the left-hand side of the diagram would be found in a – in a – in a first unit. [redacted]

(Ex. 3 at 129:1-9.) Because the same language is used to describe the requirements of the second unit, it must also include the second software components.

Numerous passages from the '437 patent specification reinforce the requirement that the "second software components" are on the "second unit," with no disclosures of second software components located anywhere <u>other</u> than on the second unit. For example, the Abstract explains that the invention includes second software components in the second unit: "The first and second units include, respectively, first and second protocol stacks and first and second session layers, which interface between the first and second protocol stacks and **first and second software components acting within the first and second units, respectively.**" (Ex. 2 at Abstract) (emphasis added). The patent then explains that "[t]he invention enables a first software in the first unit to retain communications sessions **with a second software in the second unit** when switching communications networks." (*Id.* at 8:10-12) (emphasis added); *see also* (*id.* at 9:36-52) ("The second session layer 21 has a second interface 21*b* against overlying second software components 25."). This architecture is illustrated in Figure 1, annotated below to show the software components (labeled 25, in yellow) within the second unit (labeled 2, in green):




(Ex. 2 at Fig. 1) (highlighting added); *see also* (*id.* at 9:41-52, 11:40-45) (indicating that element 25 in Figure 1 (highlighted yellow) refers to the second software components).

Claim 1 requires that the second software components are located on the "second unit" and that the second software components on the second unit are one of the end points of the communications between the first software components on a first unit and the corresponding second software components on the second unit. (*See* Ex. 2 at Claim 1); *see also* (*id.* at 4:61-5:6, 8:10-12, 9:36-52, 11:40-45, Fig. 1). Indeed, the '437 patent distinguishes between: (i) communicating devices/"units" that are the endpoints of the network communications (*i.e.*, first and second units) and (ii) other, separate "intermediate units" that can facilitate such communications between the first and second unit endpoints. (*See, e.g.*, *id.* at 11:66-12:15, 12:40-65, Figs. 3-5). The specification nowhere discloses or suggests that a single "unit" can span

multiple, separate devices that respectively have distinct, separate communications hardware, protocol stacks, etc.

Because Claim 1 requires that the "**second protocol stack**" act between the "**said second software components**" and the **"second communications hardware**" of the claimed "**second unit**," Plaintiffs must show that the alleged second protocol stack acts on data coming from the claimed second software components before being passed to the second communications hardware located on the same second unit (or in the reverse direction when receiving data). (*See* Ex. 2 at Claim 1[B], 1[D]). They fail to do so. Rather, the alleged "second protocol stack" and "second communications hardware" that Dr. Shoemake identifies are located on a separate, distinct "unit"/device (*i.e.*, the Mobility Server) from the "unit"/device that contains the alleged "second software components" (*e.g.*, an application server), which contains its own separate, distinct protocol stack and communications hardware. (*See, e.g.*, Ex. 4 at ¶¶ 465 (second unit is the "Windows server running the Mobility Server software" and including diagram), 472 (second software components are on the application server)).

At points in his infringement report, Dr. Shoemake acknowledged that the disclosure of the '437 patent indicated that the second software components are required to be on the second unit: "There are also software components in the first and second units." (*Id.* at ¶ 370; *see also* ¶ 371). But Dr. Shoemake failed to apply this construction in his infringement analysis. He disregarded the plain language of Claim 1 and took the unsupported position that the claim limitation "does not require the second software components to be housed within the second unit." (Ex. 3 at 89:13-14).

Dr. Shoemake failed to identify anything on the so-called "second unit" that corresponds to the second software components. To the contrary, both in his expert report and at deposition, Dr. Shoemake opined that the second software components in the NetMotion system need <u>not</u> be on the second unit at all:

> Q: Okay. And then on the right-hand side, are all of these boxes on the right-hand side part of the second unit?
>
> A: **So the – the second unit, in my view, could just be the – include** [redacted] **And as we previously discussed, *the server applications could be on a different unit* and that would be inside the claim limitation as well.** And so the second unit can be a subset of those boxes or all of them.

(*Id.* 129:16 – 130:7) (emphasis added). In fact, Dr. Shoemake has not pointed to any evidence that the second software components are ever on the second unit. (*Id.* at 131:3-13); *accord* (Ex. 4 at ¶¶ 428-39, 464-79). Therefore, Defendants are entitled to a judgment of noninfringement.

**3. Plaintiffs have no evidence that the accused products "provid[e] said [first/second] unit with a [first/second] session layer which is adapted to act as an interface between said [first/second] protocol stack and said [first/second] software components…."**

Defendants are also entitled to summary judgment of noninfringement because Plaintiffs have not provided evidence that the NetMotion Accused Product provides either the "first unit" or the "second unit" with ***a session layer adapted to act as an interface between the first/second protocol stack and the first/second software components***. Claim 1 of the '437 patent requires:

> [1[C]] providing said first unit with a first session layer which is <u>adapted to act as an interface between said first protocol stack and said first software components;</u>
>
> [1[D]] providing said second unit with a second session layer which is <u>adapted to act as an interface between said second protocol stack and said second software components;</u>

(Ex. 2 at Claim 1) (emphasis added).

In order to show infringement, Plaintiffs must prove that both the first and second units have a first/second session layer that acts as an interface **<u>between</u>** the protocol stack and the first/second software components, respectively. Fatally, however, Dr. Shoemake identifies

**<u>nothing</u>** in the accused first/second unit of the NetMotion Accused Product that is an interface **<u>between</u>** the first/second software components and the protocol stack of the unit on which the software components reside. This is illustrated in paragraph 282 of his opening report, in which he provides a diagram of the NetMotion Accused Product, reproduced below, with annotations showing where an interface between the first/second software components (what Dr. Shoemake maps to the "Client Applications" and "Server Applications") and a protocol stack would need to be. But nothing in the NetMotion Accused Product occupies that space:




(Ex. 4 at ¶ 282) (Annotations and text in purple added).

Dr. Shoemake attempts to disguise this critical defect in his infringement analysis, [redacted]

Dr. Shoemake's mapping on the second unit suffers an even bigger deficiency: what Dr. Shoemake identifies as the purported "second protocol stack" does not even exist on the same unit

as the alleged "second software components." The second software components (shown in the upper right blue box) interface with an entirely separate protocol stack (shown in the second magenta or fuchsia box on the far right beneath the purple annotations in the diagram above) that is not on the same device/"unit" as the accused Mobility server software (which Dr. Shoemake alleges provides the "second session layer") at all. The alleged "second session layer" (illustrated in the green box on the right) is located on a separate intermediate unit and does not act "***between***" the separate application server's software components its TCP/IP protocol stack (shown in the rightmost column of boxes).

Furthermore, Dr. Shoemake also has not shown that any alleged first or second session layers (i.e., the Mobility client and server software) act as an "interface" between the first/second protocol stack and the first/second software components. The term "interface" was not construed by the Court so it has its plain and ordinary meaning. *See* Dkt. 194. A POSITA would understand the plain meaning of "interface" here to be "[t]he point at which a connection is made between two elements so that they can work with each other." (Ex. 5 (Microsoft Press Computer Dictionary (Microsoft Press 3rd ed., 1997)) at 257.)[4] Accordingly, Plaintiffs have the burden of showing that the claimed "session layer" in the accused NetMotion Accused Product is adapted to act as "[t]he point at which a connection is made" between said second protocol stack and said second software components.[5] As shown above, Plaintiffs lack any evidence that the NetMotion accused product has the required interfaces.

Dr. Shoemake's infringement analysis suffers from the same failure of proof as to both the first and second session layers: Shoemake fails to show that either the first or second session layer

---

[4] Plaintiffs' claim construction expert, Dr. Zygmunt Haas, relied on this same dictionary to opine on the plain and ordinary meaning of claim terms in his opening and rebuttal expert declarations. (*See* Ex. 6 (Haas Decl.); Ex. 7 (Haas Rebuttal Decl.)).

[5] To the extent that Dr. Shoemake is attempting to redefine "interface" as something other than "[t]he point at which a connection is made between two elements so that they can work with each other," Dr. Shoemake's opinion is inconsistent with the plain and ordinary meaning of the term. (Ex. 5 at 257). Such issues regarding meaning and scope of the claim terms falls upon the Court to resolve, and not the jury. *O2 Micro Int'l,* 521 F.3d at 1361-62.

acts as an **<u>interface between</u>** the software components and the protocol stack. To explain in the context of the second unit, as shown below in the red box on the excerpted version of Dr. Shoemake's diagram, Dr. Shoemake testified that the "second unit" comprises four parts—(1) a hardware adapter, (2) a UDP/IP stack, (3) the NetMotion Mobility server software, and (4) another TCP/UDP stack:




(Ex. 4 at ¶ 282) (annotated); (Ex. 3 at 129:16 – 130:7; 131:3-13). The alleged session layer ([redacted]) does not act as an "interface *between*" either protocol stack ([redacted]

[redacted]. Indeed, as discussed above, Dr. Shoemake has failed to identify anything in the alleged second session layer that can act as an "interface" with the "second software components" at all. Likewise, for the same reasons, Dr. Shoemake has failed to identify anything in the alleged first session layer (mapped to the NetMotion Mobility Client) that can act as an "interface" with the "first software components." (Ex. 4 at ¶¶ 410-427, 440-463.)

As Dr. Shoemake has failed to show that the first and second session layers act as an "interface between" the first/second protocol stack and the first/second software components, respectively, Plaintiffs have failed to show that the NetMotion Accused Product practices all the limitations of Claim 1. Because Claim 1 is the sole independent claim for all Plaintiffs' asserted claims, Plaintiff cannot show infringement of any asserted claims, and the Defendants are entitled to judgment of noninfringement.

### B. Summary Judgment of Invalidity for Lack of Written Description

The '437 patent specification fails to show that the inventors possessed and disclosed a technique or protocol for achieving the functional outcomes recited by claim limitation 1[g]. This limitation provides:

> [i] causing said first and said second session layers to use a common session protocol <u>to ensure</u> that [ii][a] traffic belonging to different first sockets in said first software components <u>are directed by</u> traffic intended for said second software components to different second sockets in said second software components uniquely corresponding to said different first sockets, and that [b] traffic belonging to different second sockets in said second software components <u>are directed by</u> traffic intended for said first software components to different first sockets in said first software components uniquely corresponding to said different second sockets;

(Ex. 2 at 14:1-12) (color and emphasis added). The Court previously concluded that the term "traffic … are directed by traffic" required no construction, thereby indicating that the claim language should be given its plain and ordinary meaning. Dkt. 194 at 9-10.

The color and bracketed numbering has been added above to better illustrate how this claim limitation recites two nested functions. In the outer function (shown in blue text), the first and

second session layer "use a common session protocol to ensure that" the inner function reciting "traffic … are directed by traffic…" (shown in red text) is performed. The language is clear that a common session protocol recited by the outer function must "ensure" that this claimed "traffic … are directed by traffic" functionality (whatever its meaning) is achieved.

There can be no genuine dispute that—despite Plaintiffs' assertions of a novel routing technique—the '437 specification does not describe *how* a common session protocol at the first and second session layers ensures that "traffic … are directed by traffic." And, this is true whether using the plain meaning as ordered by the Court or with Plaintiffs' new theory about this inner "traffic … are directed by traffic" term.

Instead of giving any guidance, the specification merely echoes the broad, functional claim language. It describes the functional objectives or results (traffic from one socket on one device correctly reaching a uniquely corresponding destination socket on the other device) that a generic "common session protocol" should achieve without providing any examples of such protocols or explanation of how a common session protocol could or would achieve these results. For example, the '437 patent specification provides:

> The first and the second session layer are assigned the task of ensuring that traffic belonging to respective sockets in each of the first software components is corresponded by traffic intended for the second software components and belonging to a unique socket in one of the second software components, and vice versa.

(Ex. 2 at 5:1-6); (*see also* Ex. 1 at ¶689) (alleging that this portion of the specification provides written description support for limitation 1[g]). This disclosure provides no explanation whatsoever regarding *how* the first and second *session layers* (or protocols therein) are to accomplish the task that they are assigned—ensuring that traffic from sockets on one device correctly reaches the uniquely corresponding destination sockets on the other device.

The only other portions of the specification alleged to provide written description support for limitation 1[g] that Dr. Shoemake identifies in his rebuttal report (including that reproduced below) suffer from the same defects. (*See* Ex. 1 at ¶¶689-698).

> The first and the second session layer 11, 21 use a common session protocol to ensure that for each of the first sockets 11b1, 11b2, 11b3 created by the first software components 15 in the first interface 11b there are created corresponding second sockets 21b1, 21b2 , 21b3 in the second interface 21b, and that subsequent traffic belonging to each of the said first sockets 11b1, 11b2, 11b3 is corresponded by the traffic intended for the second software components 25 and belonging to intended unique second sockets 21b1, 21b2, 21b3, and vice versa. When a socket is stream-based, the session protocol ensures that all traffic will arrive in the correct order and that no traffic will be excluded.

(Ex. 1 at 9:41-52); *see also* (*id.*, Fig. 1). This portion of the specification referencing Figure 1 also provides no explanation regarding *how* this task assigned to the common session protocol is accomplished. It provides no disclosure *how* the common session protocol operates so that traffic from each of the first sockets is indeed "corresponded by the traffic … belonging to intended unique second sockets … and vice versa." *See id*. The specification, like the claims, merely says to "use" the common session protocol, but nothing in the specification ever says *how* it works.

Like claim limitation 1[g] itself, the '437 patent specification merely describes the intended objective/task to be performed by common session protocol; it does not disclose any means or techniques for accomplishing this objective. The generically claimed "common session protocol" formed by the first and second session layers is merely a black box described exclusively in terms of the functions it performs. This is insufficient to satisfy the written description requirement. *See Ariad*, 598 F.3d at 1352 ("The written description requirement also ensures that when a patent claims a genus by its function or result, the specification recites sufficient materials to accomplish that function.").

The precedential *LizardTech* case is instructive. 424 F.3d at 1344-46. In *LizardTech*, the patent specification described one particular method for creating a "seamless DWT" (discrete

wavelet transform), used in performing digital image compression, "which [was] to 'maintain updated sums' of DWT coefficients." *Id.* at 1337, 1344. The challenged claim, however, included no limitations as to how the claimed creation of a seamless DWT was to be accomplished. *Id.* at 1344-45. The Federal Circuit found that there was no support for such a broad claim in the specification, which provided "only a single way of creating a seamless DWT" and where there was "no evidence that the specification contemplate[d] a more generic way of creating a seamless array of DWT coefficients." *Id.* The Federal Circuit held that "the description of one method for creating a seamless DWT does not entitle the inventor of the [asserted] patent to claim any and all means for achieving that objective." *Id.* at 1346.

Here, the '437 patent specification falls even shorter than the specification at issue in *LizardTech*. The specification fails to describe *any* method for achieving the recited objective of ensuring "traffic … are directed by traffic" to uniquely corresponding sockets at the destination device—not even a single example. Accordingly, the rationale behind the holding in *LizardTech* applies with even more force here. The inventors of the '437 patent—who have not described *even one* example or method of creating a common session protocol that ensures that traffic is properly directed to uniquely corresponding sockets—have attempted but are not entitled to generically claim any and all means for achieving that objective. The Asserted Claims are invalid for failure to satisfy the written description requirement. *Id.*; *see also Ariad*, 598 F.3d at 1358 ("Whatever thin thread of support a jury might find in the decoy-molecule hypothetical simply cannot bear the weight of the vast scope of these generic claims."); *Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1158-59 (Fed. Cir. 1998) (ruling that disclosure of only two species of conical-shaped cups and nothing broader did not adequately support generic claims that did not require any particular cup shape).

Again, this is true regardless of whether the Court applies its construction or Plaintiffs' new (also unsupported) construct. To rule on summary judgment for lack of written description, the Court need only focus on the nested internal function (bracketed [ii] above), while the '437

patent lacks written description even for the outer function (bracketed [i] above). Specifically, the lack of written description attaches to the failure to adequately describe a common session protocol for the first and second session layers, while the claim construction disputes is over whether units of traffic must direct other units of traffic.[6]

Under Absolute's understanding of this term—which gives actual meaning to the language that recites traffic "are directed by traffic"—there is no disclosure in the '437 specification of any *session layer protocols* that allow or cause network traffic (*e.g.*, packets) *to themselves direct* other traffic from unique sockets in the originating device to the correct uniquely corresponding destination sockets on the destination device. For example, there are no session layer protocols described in the '437 specification that would allow or cause the traffic routing behavior the Court described in its claim construction order wherein subsequent traffic simply follows—and is "in a sense" directed by—the earlier traffic. *See* Dkt. 194 at 10; (*see generally* Ex. 2 at 5:1-6, 9:41-52, Fig. 1). It follows that there is also no description regarding how such an undisclosed, hypothetical protocol would ensure that the subsequent follower traffic would be correctly directed to the "uniquely corresponding" destination sockets, particularly in circumstances where there are multiple sockets open and used simultaneously for communications between the first and second units.

Sectra, in contrast, ignores and fails to give meaning to the recited language that traffic be "directed *by traffic*" and simply focuses on the remaining language of this claim term. (*See, e.g.*, Ex. 1 at ¶680 ("In other words, there is traffic coming from specific sockets in the first software components (e.g. e-mail application on a mobile device) *that is then directed to*[7] the proper destination, i.e. a socket on the second unit (e.g. e-mail server), according to where traffic is intended to be … . The limitation makes clear that there is also a unique correspondence between

---

[6] The Court of course can also resolve the claim construction dispute, which is relevant to Defendants' separate ground for summary judgment of non-infringement of the "traffic … are directed by traffic" limitation.

[7] Dr. Shoemake does not explain specifically *what*, in his opinion, is directing this traffic.

one of the first sockets and the destination second socket ('uniquely corresponding to the different first socket') (blue)." (emphasis added)); *see also id.* at ¶¶678-679, 681). Yet, even under this incomplete interpretation of this claim term where Sectra ignores the Court's claim construction order, Sectra has not pointed to and cannot point to any disclosure in the specification that describes *how* the claimed *common session protocol* ensures that traffic "is [] directed to the proper destination"—*i.e.*, the destination socket on the other device uniquely corresponding to the originating socket. (*See id.* at ¶¶689-695, citing '437 patent, 5:1-6, 9:41-52, Fig. 1).

The Court should reject any attempts by Sectra to argue that the '437 specification somehow <u>inherently</u> discloses how the claimed common session protocol works to ensure the claimed functionality. *See Tronzo*, 156 F.3d at 1159 ("In order for a disclosure to be inherent, [] the missing descriptive matter must necessarily be present in the [] specification."). For example, any attempt to argue that the '437 patent's disclosure that the first and second session layers indicate an "identity" corresponding to the opposite first/second unit and first/second *software components* (*see, e.g.*, Ex. 2 at 6:5-9, 13:62-67) is unavailing to show that the specification necessarily describes how the claimed "common session protocol" works to ensure that traffic from a particular originating *socket* is directed to the correct uniquely corresponding destination *socket*. This is so because software components/applications and the sockets used by those applications are not the same thing and are not necessarily coextensive. (*See, e.g.*, Ex. 2 at 14:1-12) (separately reciting first and second software components and first and second sockets used by those software components).

Indeed, Sectra's technical expert Dr. Shoemake admitted that a single software application can have multiple sockets open simultaneously when engaged in network communications. (Ex. 8 (Shoemake June 19, 2024 Tr.) at 125:13-126:17) (agreeing that an application can have more than one socket open at a time to another application and estimating the Zoom application he was using had between 4 and 20 open sockets at that time). This means that an "identity" corresponding to an application/software component does not necessarily correspond to a particular socket used

by that application and thus does not inherently disclose how a claimed "common session protocol" works to ensure traffic is correctly routed between "uniquely corresponding" socket pairs. *See Driessen v. Sony Music Entertainment*, 640 F. App'x 892, 896 (Fed. Cir. 2016) (affirming the district court's finding of invalidity for lack of written description based on its finding that discussion of related terminology did not necessarily imply or require the recited claim elements).

Similarly, any attempt to point to the '437 specification's disclosure regarding how known protocols or application programing interfaces (*e.g.*, TCP, WinSock) can interact or interface with the disclosed session layers (*e.g.*, Ex. 2 at 4:39-49, 4:61-67) is insufficient to disclose the internal workings of the generically claimed, purportedly *novel* "common session protocol" that might allow it to perform the claimed functionality. Any arguments relying on such disclosure are merely disguised (or possibly overt) assertions that a person of ordinary skill would have found it obvious from the '437 specification how to create a common session protocol that performs the recited function of ensuring traffic is correctly directed between uniquely corresponding sockets. This is insufficient to satisfy the written description requirement. *Lockwood*, 107 F.3d at 1572 ("One shows that one is 'in possession' of *the invention* by describing *the invention*, with all its claimed limitations, not that which makes it obvious." (emphasis in original)).

In sum, Sectra has argued the claim limitation 1[g] is "a key and novel aspect of the invention" that purportedly recites "a novel routing technique" using a "common session protocol." *See* Dkt. 194 at 10; (Ex. 2 at 14:1-12); (Ex. 1 at ¶¶405, 503) (opining "[h]owever, claim element 1g of the '437 Patent does not merely recite the use of SSL or sockets API. Instead, claim element 1g of the '437 Patent recites a novel routing technique …"). But the Asserted Claims are invalid for lack of written description because nowhere does the '437 specification disclose (expressly or inherently) what allegedly novel routing techniques or means the generically claimed "common session protocol" uses or could use to perform the claimed function of ensuring that traffic from an originating socket on one device is properly directed to the correct "uniquely

corresponding" socket on the destination device. *LizardTech*, 424 F.3d at 1344-46; *Ariad*, 598 F.3d at 1358; *Tronzo*, 156 F.3d at 1158-59.

## V. CONCLUSION

Based on the arguments and evidence provided above, Defendants respectfully requests summary judgment of invalidity for lack of written description and noninfringement of all remaining asserted claims.

Dated: July 12, 2024

I certify that this memorandum contains 7710 words, in compliance with the Local Civil Rules.

<u>*/s/ Heidi L. Keefe*</u>

Heidi L. Keefe (*pro hac vice*)
Reuben H. Chen (*pro hac vice*)
Alexandra Leeper (*pro hac vice*)
COOLEY LLP
3175 Hanover St.
Palo Alto, CA 94304-1130
Tel.: (650) 843-5000
Fax: (650) 849-7400
Email: hkeefe@cooley.com
Email: rchen@cooley.com
Email: aleeper@cooley.com

Orion Armon (*pro hac vice*)
COOLEY LLP
1144 15th Street, Suite 2300
Denver, CO 80202-2686
Tel.: (720) 566-4000
Fax: (720) 566-4099
Email: oarmon@cooley.com

Christopher B. Durbin (WSBA No. 41159)
COOLEY LLP
1700 Seventh Avenue, Suite 1900
Seattle, WA 98101-1355
Tel.: (206) 452-8796
Fax: (206) 452-8800
Email: cdurbin@cooley.com

Attorneys for Defendants ABSOLUTE SOFTWARE, INC. and MOBILE SONIC, INC.