# Exhibit 7

THE HONORABLE RICARDO S. MARTINEZ

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SECTRA COMMUNICATIONS AB,<br>Plaintiff,<br>v.<br>ABSOLUTE SOFTWARE, INC. and NETMOTION SOFTWARE, INC.,<br>Defendants. | Case No. 2:22-cv-00353-RSM<br>**DECLARATION OF DR. ZYGMUNT J. HAAS**<br>**JURY TRIAL DEMANDED** |

## I. INTRODUCTION

1. My name is Dr. Zygmunt J. Haas. I make this declaration based upon my own personal knowledge and, if called upon to testify, would testify competently to the matters contained herein.

2. I have been asked to review the Declaration of Dr. Nathaniel Polish in Support of Defendants' Opening Claim Construction Brief (dated February 27, 2023) ("**Polish Opening Declaration**" or "**Polish Op. Decl.**"). This declaration, in response to the Polish Opening Declaration, relates to how a person of ordinary skill in the art ("**POSITA**") would have understood the terms of the U.S. Patent No. 7,797,437 (**"the '437 Patent"**) at the time of invention, and the terms of the U.S. Patent No. 6,981,047 (**"the '047 Patent"**) at the time of alleged invention. To the extent I may not address in this declaration any particular issue raised



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

in the Polish Opening Declaration, that does not necessarily mean that I agree with the opinion of Dr. Polish on the issue.

3. In formulating my opinions, I have relied upon my knowledge, training, and experience in the relevant art. My qualifications are stated more fully in my previous declaration dated February 27, 2023 ("**Haas Op. Decl.**"), which has also my curriculum vitae. In preparation of this declaration, I have reviewed the '437 Patent (including its specification and prosecution history), the '047 Patent (including its specification and prosecution history), the materials cited throughout my declaration (which are listed in Appendix A), as well as the Polish Opening Declaration and materials cited therein. The legal standards that I used in preparation of this declaration is specified in my previous declaration dated February 27, 2023.

## II. OPINIONS CONCERNING CLAIM CONSTRUCTION AND DEFINITENESS OF TERMS OF THE '437 PATENT

### A. Preamble: "A method of maintaining communication between a first unit and a second unit, wherein said first unit is comprised of a geographically mobile unit and includes a first protocol stack adapted to act between a first communications hardware used for communication via a first communications network and one or more first software components, and wherein said second unit includes a second protocol stack adapted to act between a second communications hardware used for communication via a second communications network and one or more second software components" (claim 1)

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| Not limiting. Plain and ordinary meaning.[1] | Preamble is limiting |

4. I understand that claim terms are to be evaluated within the context of which they appear. Claim 1 of the '437 Patent is reproduced below, with the preamble emphasized:

> 1. **A method of maintaining communication between a first unit and a second unit,**
>
> **wherein said first unit is comprised of a geographically mobile unit and includes a first protocol stack adapted to act between a first communications hardware used for communication via a**

[1] I have been provided by counsel both Plaintiff's and Defendants' proposed constructions, which are reproduced throughout this declaration for each term on which I opine.



CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

> **first communications network and one or more first software components, and**
>
> **wherein said second unit includes a second protocol stack adapted to act between a second communications hardware used for communication via a second communications network and one or more second software components**,
>
> the method comprising the steps of:
>
> providing said first unit with a first session layer which is adapted to act as an interface between said first protocol stack and said first software components;
>
> providing said second unit with a second session layer which is adapted to act as an interface between said second protocol stack and said second software components;
>
> causing said first session layer to indicate a first identity corresponding to said second unit and said second software components;
>
> causing said second session layer to indicate a second identity corresponding to said first unit and said first software components;
>
> causing said first and said second session layers to use a common session protocol to ensure that traffic belonging to different first sockets in said first software components are directed by traffic intended for said second software components to different second sockets in said second software components uniquely corresponding to said different first sockets, and that traffic belonging to different second sockets in said second software components are directed by traffic intended for said first software components to different first sockets in said first software components uniquely corresponding to said different second sockets;
>
> providing said first unit with one or more first communications hardware with associated drive routines adapted to different communications networks;
>
> in the event of said first unit switching from said first communications network to a third communications network, causing said first session layer to maintain said communication between said first unit and said second unit by selecting necessary first communications hardware and drive routines for said third communications network; and causing said second session layer to retain said second identity during the switching of said first unit
>
> from said first communications network to said third communications network.

’437 Patent at claim 1 (emphasis added).



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

5. Dr. Polish contends that the preamble is limiting because the preamble provides an antecedent basis for certain terms of Claim 1, including the "first unit" and "second unit," and lays out the relationship between components in the first and second units. Polish Op. Decl. at ¶ 28. However, Dr. Polish provides no justification for requiring that the entirety of the preamble be limiting. In my opinion, a POSITA would have understood the meaning of the rest of the preamble and claim regardless of any context provided by the portion of the preamble that recites "[a] method of maintaining communication between." Thus, in my opinion, the portion of the preamble that recites "[a] method of maintaining communication between" is not limiting.

**B. "first unit" (claim 1)**

| **Plaintiff's Construction** | **Defendants' Construction** |
|---|---|
| No construction necessary / Plain and ordinary meaning | First unit includes a geographically mobile unit |

6. Claim 1 of the '437 Patent is excerpted below, with the term "first unit" emphasized:

> 1. A method of maintaining communication between a **first unit** and a second unit,
>
> wherein said **<u>first unit</u> is comprised of a geographically mobile unit** and includes a first protocol stack adapted to act between a first communications hardware used for communication via a first communications network and one or more first software components, and … .

'437 Patent at claim 1 (bold and underline emphasis added).

7. Dr. Polish contends that "the claims refer to the first unit as including geographically mobile units" Polish Op. Decl. at ¶ 35; *see also id.* at page 12 (Dr. Polish reproducing Defendants' proposal to construe "first unit" as "First unit includes a geographically mobile unit"). To the extent that Dr. Polish intends to require that first unit include plural "geographically mobile ***units***," I disagree. The plain language of Claim 1 recites the "first unit



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

is comprised of **a** geographically mobile unit." '437 Patent at claim 1 (bold and underline emphasis added). A POSITA would have understood from the "comprised of" language that the first unit may have more than just the singularly recited "a geographically mobile unit," but that it does not necessarily need to have anything more than just a singular "geographically mobile unit." Moreover, a POSITA would have understood the meaning of "comprised of" in the phrase "first unit is comprised of a geographically mobile unit" without requiring additional interpretation. Thus, the addition of "includes a geographically mobile unit" in a claim that already recites "comprised of a geographically mobile unit" does nothing to clarify the meaning of the phrase as a whole, and such an addition is unnecessary and redundant.

**C. "mobile unit" (claim 1)**

| **Plaintiff's Construction** | **Defendants' Construction** |
|---|---|
| No construction necessary / Plain and ordinary meaning | Handheld mobile computing device, such as a PDA or mobile telephone |

8. Dr. Polish contends that, at the time of the '437 Patent, "mobile computing devices typically took the form of either PDAs or mobile telephones," which, in Dr. Polish's view, "are types of handheld mobile computing devices." Polish Op. Decl. at ¶ 37. Dr. Polish also contends that "*all* of the disclosures provided in the ['437 Patent] specification for the mobile unit refer to *handheld* mobile computing devices, such a s PDAs or mobile telephones." Polish Op. Decl. at ¶ 54 (emphasis added). I disagree with Dr. Polish. The '437 Patent specification and claims never use the word "handheld" to describe or limit the types of mobile units disclosed and claimed therein. Indeed, there is no expression of manifest exclusion or restriction in the '437 Patent specification that a POSITA would have understood to be a clear disavowal of mobile units that are not necessarily "handheld." To the opposite, as I explain in further detail below, the '437 Patent discloses embodiments that utilize technology that a POSITA would have



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

associated with laptop computers, which are a type of mobile unit that would be excluded from Dr. Polish's construction limited to "handheld" devices. *See, e.g.*, '437 Patent at 4:61-67 (referring to "Windows-based" devices), 9:23-26 (describing a "Windows-based computer unit" using "WinSock SPI"). Thus, while a POSITA would have understood that a "mobile unit" in the context of the '437 Patent could include a handheld device, the "mobile unit" recited in the claims is not limited to handheld devices.

9. Dr. Polish cites various disclosures regarding mobile telephony from the portion of the background section of the '437 Patent that describes "Technical problems" addressed by certain embodiments of the '437 Patent. Polish Op. Decl. at ¶ 37 (citing '437 Patent at 2:57-58, 2:64-65, 3:5-8, 3:9-10); *see also* '437 Patent at 1:64-4:21. However, Dr. Polish overlooks embodiments in '437 Patent that utilize "Windows-based" computing devices with interfaces based on WinSock SPI. *See* '437 Patent at 4:39-4:44 (disclosing embodiment where the "first unit is Windows-based" with a first interface "based on WinSock SPI"), 4:61-67 (referring to "Windows-based" devices), 9:23-26 (describing a "Windows-based computer unit" using "WinSock SPI"). Notably, the "mobile unit" in Claim 1 of the '437 Patent is recited as being included within the "first unit." '437 Patent at claim 1 ("wherein said first unit is comprised of a geographically mobile unit"). Dependent Claim 16 recites that the "second unit" also includes a "mobile unit." *Id.* at claim 16 ("wherein said second unit is also comprised of a geographically mobile unit"). The '437 Patent specification refers to both of these first and second units as Windows-based computer units. *Id.* at 9:23-26 ("In one preferred embodiment, the first unit 1 is a windows-based computer unit and the first interface 11*b* is based on WinSock SPI for a Layered Service Provider."), 9:37-40 ("In one preferred embodiment, the second unit 2 is a Windows-based computer unit and the second interface 21*b* is based on WinSock SPI for a Layered Service Provider."). As I explained in Paragraphs 32-35 of my opening declaration dated February 27, 2023, a POSITA would have understood that such Windows-based computer units running the



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

Winsock SPI would include laptop computers, vehicle-mounted computers, and other such devices that are not necessarily "handheld."

10. Dr. Polish cites to portions of the '437 Patent specification that refer to the first unit being "Pocket PC-based" or "Palm-OS based" to formulate his contention that the '437 Patent should be limited to "handheld" devices. *See* Polish Op. Decl. at ¶¶ 39-40 (citing '437 Patent at 4:11-16 (referring to "Pocket-PC-based computer units"), 4:44-45 (describing embodiment where "first unit is PalmOS-based")). But, according to the '437 Patent, the "PalmOS-based" and "Pocket-PC based" embodiments of first unit 1 are "alternative[s]" to the embodiment where "the first unit 1 is a windows-based computer unit." '437 Patent at 9:22-35. And, as I describe directly above, a POSITA would have understood that such "Windows-based computing devices" would include devices that are not necessarily handheld (e.g., laptop computers and vehicle-mounted computers). Thus, while the term "mobile unit" in the context of the '437 Patent could include a handheld device, a POSITA would have understood that the term "mobile unit" in the context of the '437 Patent is not limited to handheld devices only.

11. Another technology utilized by embodiments in the '437 Patent is "Mobile-IP." *See, e.g.*, '437 Patent at 4:14, 7:49-50, 12:64-65. Dr. Polish contends that the types of devices that ran Mobile-IP at the time of the '437 Patent included handheld mobile telephones and PDAs. Polish Op. Decl. at ¶ 38. Dr. Polish later concludes that Mobile-IP was "not designed for use by laptops." *Id.* at ¶ 54. I disagree with Dr. Polish. One document establishing what was and is known as the Mobile-IP standard has been RFC 2002 published by the Internet Engineering Task Force ("IETF"). *See* RFC 2002 at § 1.4 ("Mobile IP is intended to enable nodes to move from one IP subnet to another."). RFC 2002 specifically describes use-cases whereby a "laptop computer" is the mobile device:

> A **laptop computer** is disconnected from its home network and later attached to a network port in the seat back of an aircraft. The **laptop computer** uses Mobile IP to register on this foreign network, using



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

> a foreign agent care-of address discovered through an Agent Advertisement from the aircraft's foreign agent.

*Id.* at § 4.5(a) (emphasis added).

> The **laptop's** home agent intercepts the datagram on the home network and tunnels it to the **laptop's** care-of address, which in this example is an address of the node serving as router and foreign agent on the aircraft. Normal IP routing will route the datagram to the fixed network at the airline's headquarters.

*Id.* at § 4.5(d).

12. Dr. Polish also contends that the '437 Patent specification provides only one example of a specific device using Mobile-IP, and points to a description in the background section of the '437 Patent. Polish Op. Decl. at ¶ 39 (citing '437 Patent at 4:11-16). But, Dr. Polish mischaracterizes the '437 Patent specification. The '437 Patent explains that in some embodiments, "third unit 3 may be a Mobile-IP Home Agent." '437 Patent at 12:64-65; *see also id.* at 7:49-50 ("The third unit may be an SIP registrar server or a Mobile-IP Home Agent."). As defined in RFC 2002, a "Home Agent" is "[a] router on a mobile node's home network which tunnels datagrams for delivery to the mobile node when it is away from home, and maintains current location information for the mobile node." RFC 2002 at § 1.5. And as described in RFC 2002, the home agent may operate in conjunction with mobile devices such as laptop computers. *See id.* at § 4.5(d) ("The **laptop's home agent** intercepts the datagram on the home network and tunnels it to the **laptop's** care-of address … .") (emphasis added). Thus, based on embodiments disclosed in the '437 Patent, a POSITA would have understood that the term "mobile unit" recited in the claims includes mobile units that are not necessarily handheld (e.g., laptop computers).

### D. "first software components" / "second software components" (claim 1)

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| No construction necessary / Plain and ordinary meaning | Overlying software application with which the claimed invention interfaces |



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

13. Claim 1 of the '437 Patent is reproduced below, with the "first software components" and "second software components" language emphasized:

> 1. A method of maintaining communication between a first unit and a second unit,
>
> wherein said first unit is comprised of a geographically mobile unit and includes a first protocol stack adapted to act between a first communications hardware used for communication via a first communications network and one or more **first software components**, and
>
> wherein said second unit includes a second protocol stack adapted to act between a second communications hardware used for communication via a second communications network and one or more **second software components**,
>
> the method comprising the steps of:
>
> providing said first unit with a first session layer which is adapted to act as an interface between said first protocol stack and said **first software components**;
>
> providing said second unit with a second session layer which is adapted to act as an interface between said second protocol stack and said **second software components**;
>
> causing said first session layer to indicate a first identity corresponding to said second unit and said **second software components**;
>
> causing said second session layer to indicate a second identity corresponding to said first unit and said **first software components**;
>
> causing said first and said second session layers to use a common session protocol to ensure that traffic belonging to different first sockets in said **first software components** are directed by traffic intended for said **second software components** to different second sockets in said **second software components** uniquely corresponding to said different first sockets, and that traffic belonging to different second sockets in said **second software components** are directed by traffic intended for said **first software components** to different first sockets in said **first software components** uniquely corresponding to said different second sockets;
>
> providing said first unit with one or more first communications hardware with associated drive routines adapted to different communications networks;



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

> in the event of said first unit switching from said first communications network to a third communications network, causing said first session layer to maintain said communication between said first unit and said second unit by selecting necessary first communications hardware and drive routines for said third communications network; and
>
> causing said second session layer to retain said second identity during the switching of said first unit from said first communications network to said third communications network.

’437 Patent at claim 1 (emphasis added).

14. Dr. Polish first contends that a POSITA would understand that the “first software components” and the “second software components” recited in Claim 1 correspond to the “overlying first software components 15” and “overlying second software components 25” disclosed in the ’437 Patent specification. Polish Op. Decl. at ¶ 59 (citing ’437 Patent at 9:22-23, 9:36-37). However, the importation of the word “overlying” from example embodiments in the ’437 Patent specification into Claim 1 does nothing to clarify the meaning of Claim 1, because Claim 1 itself already indicates how the “first software components” and “second software components” interact with other aspects of the claim. For example, Claim 1 recites how the “first software components” interact with the first session layer and first protocol stack. *See* ’437 Patent at claim 1 (“providing said first unit with a first session layer which is adapted to act as an interface between said first protocol stack and said first software components”). Likewise, Claim 1 recites how the “second software components” interact with the second session layer and second protocol stack. *See* ’437 Patent at claim 1 (“providing said second unit with a second session layer which is adapted to act as an interface between said second protocol stack and said second software components”).

15. I also disagree with Dr. Polish’s apparent contention that the term “software components” should be replaced by “software applications.” *See* Polish Op. Decl. at ¶¶ 60-61. In addition to using reference numeral 15 and 25 to refer to “first software components 15” and “second software components 25,” (’437 Patent at 9:22-23, 9:36-37), the ’437 Patent also refers



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

to "programs [15/25]" (*id.* at 11:9-13). Dr. Polish contends that a POSITA reading the specification of the '437 Patent "would understand that the term 'software components' refers to programs and applications … ." Polish Op. Decl. at ¶ 60. I agree that the term "software components" is inclusive of both software programs and software applications. But, because the recited "software components" can include both software programs and software applications, I disagree with the substitution of the broad claim term "software components" with Dr. Polish's chosen language, "software application."

16. Further, Defendants' and Dr. Polish's proposed construction requires that the first and second software components interface with the "claimed invention," thereby separating the first and second software components from the claimed invention. As shown in the above reproduction of Claim 1, the "first software components" and "second software components" are recited throughout Claim 1 and are part of the overall invention recited by Claim 1. *See* '437 Patent at claim 1. Thus, a POSITA would not have understood the first and second software components to be separate from the "claimed invention" as implied by Defendants' and Dr. Polish's construction.

17. Defendants' and Dr. Polish's construction requires that the first and second software components "interface[]" with the "claimed invention." But Dr. Polish also admits that a POSITA "would understand that the first and second units have session layers that interface with software components 15 and 25 in Figure 1" of the '437 Patent specification. Polish Op. Decl. at ¶ 60. Indeed, Claim 1 recites "providing said first unit with a first session layer which is adapted to act as an **interface** between said first protocol stack and said first software components" and "providing said second unit with a second session layer which is adapted to act as an **interface** between said second protocol stack and said second software components." '437 Patent at claim 1 (emphasis added). Thus, Defendants' and Dr. Polish's construction effectively characterizes the "claimed invention" as the first and second session layers. But, as



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

shown in the above reproduction of Claim 1, the first and second session layers of the first and second units form a portion (not the entirety) of the overall invention recited by Claim 1. The construction proposed by Defendants and Dr. Polish therefore conflicts with how a POSITA would have read Claim 1.

18. Finally, Dr. Polish contends that a POSITA reading Claim 1 would understand that "the '[first/second] software components' correspond to the 'overlying software application with which the claimed invention interfaces.'" Polish Op. Decl. at ¶ 61. But, Claim 1 recites a "method of maintaining communication between a first unit and a second unit." '437 Patent at claim 1. Dr. Polish offers no explanation as to how the first and second software components would "interface" with a method. *See id.* In my opinion, based on the language of the claims, a POSITA would have understood that the first and second software components are part of Claim 1's method for maintaining communication between a first unit and a second unit, rather than elements that interface with the method recited by Claim 1.

**E. "traffic belonging to different [first/second] sockets in said [first/second] software components are directed by traffic intended for said [second/first] software components to different [second/first] sockets in said [second/first] software components uniquely corresponding to said different [first/second] sockets" (claim 1)**

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| No construction necessary / Plain and ordinary meaning | Indefinite |

19. Claim 1 of the '437 Patent is reproduced below, with the "traffic …" language emphasized:

> 1. A method of maintaining communication between a first unit and a second unit,
>
> wherein said first unit is comprised of a geographically mobile unit and includes a first protocol stack adapted to act between a first communications hardware used for communication via a first



CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

communications network and one or more first software components, and

wherein said second unit includes a second protocol stack adapted to act between a second communications hardware used for communication via a second communications network and one or more second software components,

the method comprising the steps of:

providing said first unit with a first session layer which is adapted to act as an interface between said first protocol stack and said first software components;

providing said second unit with a second session layer which is adapted to act as an interface between said second protocol stack and said second software components;

causing said first session layer to indicate a first identity corresponding to said second unit and said second software components;

causing said second session layer to indicate a second identity corresponding to said first unit and said first software components;

causing said first and said second session layers to use a common session protocol to ensure that **traffic belonging to different first sockets in said first software components are directed by traffic intended for said second software components to different second sockets in said second software components uniquely corresponding to said different first sockets**, and that **traffic belonging to different second sockets in said second software components are directed by traffic intended for said first software components to different first sockets in said first software components uniquely corresponding to said different second sockets**;

providing said first unit with one or more first communications hardware with associated drive routines adapted to different communications networks;

in the event of said first unit switching from said first communications network to a third communications network, causing said first session layer to maintain said communication between said first unit and said second unit by selecting necessary first communications hardware and drive routines for said third communications network; and



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

> causing said second session layer to retain said second identity during the switching of said first unit from said first communications network to said third communications network.

’437 Patent at claim 1 (emphasis added).

20. In my opinion, a POSITA would have understood the phrases, “traffic belonging to different first sockets in said first software components are directed by traffic intended for said second software components to different second sockets in said second software components uniquely corresponding to said different first sockets” and “traffic belonging to different second sockets in said second software components are directed by traffic intended for said first software components to different first sockets in said first software components uniquely corresponding to said different second sockets,” to clearly and unambiguously recite the direction of traffic from each of the different first sockets in the first software components of the first unit to the respective corresponding second sockets of the second software components of the second unit, and vice versa.

21. Dr. Polish contends that the reference in the claim “to ‘different’ sockets (plural) and use of the word ‘are’ rather than ‘is’ requires a plural or many-to-many relationship … .” Polish Op. Decl. at ¶ 62. I disagree with Dr. Polish’s “many-to-many relationship” contention, because it conflicts with both the plain language of the claim, as well as descriptions in the ’437 Patent specification. The plain language dictates that multiple “different first sockets” of the first software components associated with the first unit correspond respectively to the multiple “different second sockets” of the second software components associated with the second unit. This is not a many-to-many relationship as Dr. Polish contends. Instead, it is a one-to-one relationship that is repeated for each pair of sockets. As I explain below, this understanding of Claim 1 is confirmed by the ’437 Patent specification.

22. Figure 1 of the ’437 Patent illustrates a first unit 1 with a first session layer 11 and multiple different first sockets 11b1, 11b2, 11b3 (highlighted below with red annotations). Likewise, Figure 1 illustrates a second unit 2 with a second session layer 2 and multiple different



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

second sockets 21b1, 21b2, 21b3 (highlighted below with green annotations).



Fig. 1.

’437 Patent at Fig. 1 (annotated). The different first sockets 11b1, 11b2, and 11b3 at the first unit 1 correspond respectively to the different second sockets 21b1, 21b2, and 21b3 at the second unit 2 (e.g., first socket 11b1 corresponds to second socket 21b1, first socket 11b2 corresponds to second socket 21b2, etc.).

> The first and the second session layer 11, 21 use a common session protocol to ensure that for each of the first sockets 11*b*1, 11*b*2, 11*b*3 created by the first software components 15 in the first interface 11*b* there are created corresponding second sockets 21*b*1, 21*b*2, 21*b*3 in the second interface 21*b* … .



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

*Id.* at 9:41-45. Moreover, the first session layer 11 of the first unit 1 and the second session layer 21 of the second unit 2 use a common session protocol to ensure that traffic belonging to the different first sockets 11b1, 11b2, and 11b3 are directed to the respective corresponding second sockets 21b1, 21b2, and 21b3, and vice versa.

> The first and the second session layer 11, 21 use a common session protocol to ensure that … subsequent traffic belonging to each of the said first sockets 11*b*1, 11*b*2, 11*b*3 is corresponded by the traffic intended for the second software components 25 and belonging to intended unique second sockets 21*b*1, 21*b*2, 21*b*3, and vice versa.

*Id.* at 9:41-50; *see also id.* at 5:1-6.

23. Dr. Polish also contends that a POSITA reading Claim 1 would not understand the claim, because, in Dr. Polish's view, "traffic in network communications does not and cannot direct other traffic." Polish Op. Decl. at ¶ 63. Dr. Polish is incorrect.

24. **First**, Dr. Polish's own explanations disprove his conclusion. As explained by Dr. Polish, the '437 Patent "describes how software at the session layer in a computing device can create a communication session with another computing device during which the software and hardware on each physical computing device sends traffic to the other device using (i) device and (ii) socket address information." Polish Op. Decl. at ¶ 64. Dr. Polish adds that in the specification of the '437 Patent, "traffic would be addressed to a unique device (e.g., in a packet-switched embodiment, using an Internet Protocol or 'IP' address) and additionally be addressed to a particular communication socket within that device, and that address information would be used to (i) establish a dedicated circuit-switched connection in a circuit-switched network, or (ii) included in packet headers in a packet-switched network embodiment." Polish Op. Decl. at ¶ 64.

25. What Dr. Polish fails to appreciate is that once a route, (such as in the "dedicated circuit-switched connection" referenced by Dr. Polish, is established from a first device to a corresponding second device based on the destination address in the initial traffic from the first device to the second device, subsequent traffic within the same connection (i.e., within the



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

"dedicated circuit-switched connection" referenced by Dr. Polish) will follow the same route from the first device to the second device (at least until a handover or other routing changes in the network). In fact, the establishment of an end-to-end route, where all the subsequent traffic that follows the original traffic (that prompted the set-up of the route in the network) is not used only in circuit switching but is also used in some packet-switching networks such as those that employ *Virtual Circuit Switching*. *See e.g.*, Andrew S. Tanenbaum, Computer Networks (3rd ed. 1996) at 131 (Fig. 2-34), 145 (Fig. 2-43); William Stallings, Data and Computer Communications (Prentice-Hall, Inc. 5th ed. 1997) at 263 (Fig. 9.4(c)). For instance, as shown in the figure below, once a route (a virtual circuit) between node A and node B is established for the transmission of the first packet, all the subsequent packets for that virtual circuit connection will follow the same route.




(c) Internal virtual circuit. A route for packets between two stations is defined and labeled. All packets for that virtual circuit follow the same route and arrive in sequence.

William Stallings, Data and Computer Communications (Prentice-Hall, Inc. 5th ed. 1997) at 263 (Fig. 9.4(c)). Thus, the initial traffic (including the destination address) from the first device to the corresponding second device is what establishes the route of the connection, thereby "directing" subsequent traffic which follows the same route from the first device to the corresponding second device. Accordingly, a POSITA would have understood how subsequent



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

traffic is ***directed*** by the original traffic according to the elements recited in Claim 1 of the ’437 Patent.

26. **Second**, in the context of the ’437 Patent, the original packets (i.e., the initial traffic) created a connection of the second socket in the second software component to the first socket in the first software component, where such a connection directs future packets to follow. Thus, the flow of the future packets (i.e., follow-up traffic) from the source are routed (i.e., directed) based on the original packets (i.e., the original traffic) to sockets at the destination node.

27. To further illustrate the above process, upon a source node initiating communication with a destination node (i.e., as part of the first user data communication (traffic) from the source to the destination), the source node will create a socket (using the “`socket()`” operation) and connect (using the “`connect()`” operation) to the socket at the destination, as shown in the following figure, which is annotated Fig. 4.1 from “UNIX Network Programming” by Stevens, Fenner, and Rudoff:[2]

[2] Figure 4.1 of the Stevens, Fenner, and Rudoff book shows an initial client-to-server communication (the arrow from the `write()` at the Client to the `read()` at the Server), which can be followed by additional client-to-server communications, as indicated by the “looping” arrow from the `read()` to the `write()` at the Client. Thus, a POSITA would have understood that once a connection is established, multiple traffic flows from the Client to the Server could be conducted.



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900




Figure 4.1 Socket functions for elementary TCP client/server.

W. Richard Stevens et al., UNIX Network Programming, The Sockets Networking API, Vol. 1 (Addison-Wesley 3rd ed. 2004) at 96 (Fig. 4.1) (annotations added).

28. Creating such a connection by the original traffic establishes a *direction* for future packets on the same connection to follow. Thus, by creating the connection (socket to socket), the original traffic *directs* the packets of the future traffic. In simple terms, the packets of the future traffic "are directed" by the original traffic.

29. Simply stated, in the context of the '437 Patent, the original packets ("traffic intended for said second software components") created a connection of the second socket in the



CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

second software component to the first socket in the first software component, where such a connection directs future packets ("traffic belonging to different first sockets") to follow. Thus, the flow of the future packets from the source ("traffic belonging to different first sockets in said first software components") are routed ("are directed") based on ("by") the original packets ("traffic intended for said second software components") to sockets at the destination node ("to different second sockets in second software components").

30. Thus, a POSITA would have understood that in the context of the '437 Patent, the phrases, "traffic belonging to different first sockets in said first software components are directed by traffic intended for said second software components to different second sockets in said second software components uniquely corresponding to said different first sockets" and "traffic belonging to different second sockets in said second software components are directed by traffic intended for said first software components to different first sockets in said first software components uniquely corresponding to said different second sockets," to clearly and unambiguously recite how traffic is directed from each of the different first sockets in the first software components of the first unit to the respective corresponding second sockets of the second software components of the second unit, and vice versa.

31. Dr. Polish further states that he agrees with the assessment of the Examiner during prosecution of the '437 Patent where the Examiner asserted Claim 1 of the '437 Patent to be indefinite. Polish Op. Decl. at ¶ 67. But as I noted in paragraph 54 of my opening declaration dated February 27, 2023, the Examiner withdrew the indefiniteness rejection (*see* Reply Brief (October 15, 2009) at 1-2), and later allowed the claims (*see* Notice of Allowance (July 19, 2010)). And as I explained in paragraphs 52-54 of my opening declaration dated February 27, 2023, I agree with the Applicants' statements in both the Response to Office Action (June 19, 2008) and the Appeal Brief (May 26, 2009) as to why the initial indefiniteness rejection should be withdrawn, as well as the Examiner's withdrawal of the rejection and allowance of the claims.



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

32. For example, in the Appeal Brief, Applicants explained why the indefiniteness rejection should be reversed:

> In network communications between computer units, different layers in the units makes sure that the units can communicate with other units according to the protocols of available communications networks. At page 14, lines 5 to 13, of the present application, it is explained that the first and second session layers use a common session protocol to ensure that communication between the first and second units properly occurs.
>
> Claim 1 specifically recites that the first and said second session layers use a common session protocol to ensure that traffic belonging to different first sockets in the first software components are directed by traffic intended for the second software components to different second sockets in the second software components uniquely corresponding to the different first sockets, and that traffic belonging to different second sockets in the second software components are directed by traffic intended for the first software components to different first sockets in the first software components uniquely corresponding to the different second sockets. The first and second sockets are used to transfer information from one unit to the other. The unique correlation between the first and second sockets is what causes traffic belonging to different first sockets to be directed to different second sockets uniquely corresponding to the different first sockets so as to ensure that all traffic will arrive in the correct order and that no traffic will be excluded.
>
> In the description of the preferred embodiments section of the present application, the relationship between the first and second sockets is described as follows:
>
> > The first and the second session layer 11, 21 use a common session protocol to ensure that <u>for each of the first sockets 11b1, 11b2, 11b3 created by the first software components 15 in the first interface 11b there are created corresponding second sockets 21b1, 21b2, 21b3 in the second interface 21b</u>, and that subsequent traffic belonging to each of the said first sockets 11b1, 11b2, 11b3 is corresponded by the traffic intended for the second software components 25 and belonging to <u>intended unique second sockets 21b1, 21b2, 21b3, and vice versa</u>. When a socket is stream-based, the session protocol ensures that all traffic will arrive in the correct order and that no traffic will be excluded.
>
> Application, page 14, lines 5-13. (Emphasis added).

Appeal Brief (May 26, 2009) at 14-15.



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

33. I agree with Applicants' that it is clear from the '437 Patent specification and the language of Claim 1, that "[t]he unique correlation between the first and second sockets is what causes traffic belonging to different first sockets to be directed to different second sockets uniquely corresponding to the different first sockets so as to ensure that all traffic will arrive in the correct order and that no traffic will be excluded." *Id.* at 14. After this explanation from Applicants in the Appeal Brief, the Examiner acquiesced and rescinded the indefiniteness rejection. *See* Reply Brief (October 15, 2009) at 1-2; *see also* Examiner's Answer (August 18, 2009) (not maintaining indefiniteness rejection); Examiner's Consideration of Reply Brief (Nov. 25, 2009) at 2 (confirming that indefiniteness rejection under "112, second paragraph" had been withdrawn).

34. Moreover, the Examiner cited the "traffic …" limitation in the Notice of Allowance:

***REASONS FOR ALLOWANCE***

4. Claims 1-21, 24-25 are allowed.

5. Claims 22-23 are canceled.

6. The following is an examiner's statement of reasons for allowance.

The prior art of record fails to teach or suggest individually or in combination that wherein causing said first and said second session layers to use a common protocol to ensure that traffic belonging to different first sockets in said first software components are directed by traffic intended for said second software components to different second sockets in said second software components uniquely corresponding to said different first sockets, and that traffic belonging to different second sockets in said second software components are directed by traffic intended for said firs software components to different first sockets in said first software components uniquely corresponding to said different second sockets; and in the event of said first unit switching from said first communications network to a third communications network, causing said first session laver to maintain said communication between said first unit and said second unit bv selecting necessary first communications hardware and drive routines for said third communications; and causing said second session layer to retain said second identity during the switching of said first unit from said first communications network to said third communications network as set forth in independent claim 1 and in light of applicant's arguments filed 5/26/09 & 10/15/09.



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

*See* Notice of Allowance (July 19, 2010) at 3-4. Had the Examiner not clearly understood the meaning of Claim 1, the Examiner would not have been able to conclude that the prior art failed to teach or suggest the "traffic …" element of Claim 1 as cited by the Examiner in the "Reasons for Allowance." Indeed, as I explain above, a POSITA would have understood that in the context of the '437 Patent, the phrases, "traffic belonging to different first sockets in said first software components are directed by traffic intended for said second software components to different second sockets in said second software components uniquely corresponding to said different first sockets" and "traffic belonging to different second sockets in said second software components are directed by traffic intended for said first software components to different first sockets in said first software components uniquely corresponding to said different second sockets," to clearly and unambiguously recite how traffic is directed from each of the different first sockets in the first software components of the first unit to the respective corresponding second sockets of the second software components of the second unit, and vice versa.

**F. "first communications network" / "second communications network" / "third communications network" (claim 1)**

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| No construction necessary / Plain and ordinary meaning | Distinct, heterogenous communications networks |

35. Claim 1 of the '437 Patent is excerpted below, with the "first communications network," "second communications network," and "third communications network" language emphasized:

> 1. A method of maintaining communication between a first unit and a second unit,
>
> wherein said first unit is comprised of a geographically mobile unit and includes a first protocol stack adapted to act between a first communications hardware used for communication via a **first communications network** and one or more first software components, and



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

> wherein said second unit includes a second protocol stack adapted to act between a second communications hardware used for communication via a **second communications network** and one or more second software components,
>
> the method comprising the steps of:
>
> providing said first unit with a first session layer which is adapted to act as an interface between said first protocol stack and said first software components;
>
> providing said second unit with a second session layer which is adapted to act as an interface between said second protocol stack and said second software components;
>
> …
>
> providing said first unit with one or more first communications hardware with associated drive routines adapted to different communications networks;
>
> in the event of said first unit switching from said **first communications network** to a **third communications network**, causing said first session layer to maintain said communication between said first unit and said second unit by selecting necessary first communications hardware and drive routines for said **third communications network**; and
>
> causing said second session layer to retain said second identity during the switching of said first unit from said **first communications network** to said **third communications network**.

’437 Patent at claim 1 (excerpt) (emphasis added).

36. Dr. Polish contends that “all of the disclosures provided in the ’437 patent regarding the first, second, and third communications networks refer to distinct, heterogenous communications networks.” Polish Op. Decl. ¶ 72. I disagree. As I explained in detail in Paragraphs 41-43 of my opening declaration dated February 27, 2023, the ’437 Patent addresses problems with prior techniques that supported roaming for homogenous networks but incurred problems when used for roaming between heterogenous networks. For example, by including operation at the session layer as opposed to the link layer, embodiments of the ’437 Patent avoided problems experienced by prior solutions when switching between different heterogenous



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

networks with different types of link layers. *See* Haas Op. Decl. at ¶ 41 (citing '437 Patent background section at 2:59-67); ¶ 42 (citing '437 Patent background section at 4:24-32). Thus, unlike the prior techniques which only adequately supported roaming between homogenous networks, the embodiments of the '437 Patent support roaming not only between homogenous networks but *also* between heterogenous networks.

37. Dr. Polish incorrectly states that "all of the disclosures provided in the '437 patent regarding the first, second, and third communications networks refer to distinct, heterogenous communications networks." Polish Op. Decl. ¶ 72. This is incorrect. First, nowhere does the '437 Patent specification refer to the first, second, and third communications networks as "distinct." *See* '437 Patent. Thus, the inclusion of the word "distinct" in the construction proposed by Defendants and Dr. Polish would unnecessarily ambiguate the relationship between the first, second, and third communications networks, whose relationships are already clearly recited in the claims. It would also inappropriately limit the scope of the claim. Second, the Description of Embodiments section starting at Column 9, Line 1 of the '437 Patent does not use the word "heterogenous" anywhere to describe the first, second, or third communications networks. *See, e.g.*, '437 Patent at 9:53-59 ("The first unit 1 is connected via a first communications network A1, and the second unit 2 is connected via a second communications network A2. The first session layer 11 is assigned the task of switching A1-3 from the first communications network A1 to a third communications network A3 when necessary, and to decide when this network switch shall take place."). Dr. Polish's view that the first, second, and third communications networks must all be heterogenous networks would exclude homogenous networks from the scope of the recited first, second, and third communications networks. But, nothing in the Description of Embodiments in the '437 Patent specification excludes homogenous networks. Indeed, there is no expression of exclusion or restriction anywhere in the '437 Patent specification that a POSITA would have understood to be a clear disavowal of



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

"homogenous" networks with respect to the '437 Patent inventions.

38. There is no distinction made anywhere in the Description of Embodiments section between the ability to roam between "heterogenous" and "homogenous" networks. For example, the '437 Patent describes the first session layer having the function of switching from a first communications network to a third communications network "when necessary," as the result of *either* (i) "when a third communications network A3 becomes available and is more suitable for communication than the first communication network A1," or (ii) simply when the first communication network A1 is "no longer available." *Id.* at 9:53-65; *see also id.* at 5:1-19. A POSITA would have understood that such availability of the first communications network in the context of roaming is not dependent on whether the first and the third communications networks are homogenous networks or heterogenous networks. A POSITA would have thus understood that the "first communications network," "second communications network," and "third communications network," as recited in Claim 1 of the '437 Patent, to be agnostic as to whether those communications networks are homogenous or heterogenous.

39. Dr. Polish cites Claim 3 of the '437 Patent as alleged support for his conclusion that the first, second, and third communications networks refer to heterogenous networks. Polish Op. Decl. at ¶ 70. I do not agree that dependent Claim 3 limits the definition of "first communications network," "second communications network," and "third communications network" as recited in independent Claim 1. Claim 3 recites:

> A method according to claim 2, wherein said first session layer communicates, either continuously or periodically, with the drive routines belonging to said communications hardwares so as thereby to read information concerning the capacities and characteristics of different communications networks, such as signal strength, network availability and also the availability of requisite communications hardware.

'437 Patent at claim 3. First, Claim 3 depends from Claim 1, and any limitations of a dependent claim do not extend to the parent. Moreover, Claim 3 merely recites that the first session layer



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

communicates with the drive routines to "*read information* concerning the capacities and characteristics of different communications networks." Nothing in Claim 3 requires whether the information read by the first session layer indicates that the first, second, or third communications networks in independent Claim 1 have different (e.g., heterogenous) capacities and characteristics or similar (e.g., homogenous) capacities and characteristics. Thus, a POSITA would not have understood Claim 3 to limit the "first communications networks," "second communications networks," and "third communications networks" recited in Claim 1 to only heterogenous networks.

### G. "providing said first unit with one or more first communications hardware [with associated drive routines adapted to different communications networks]" (claim 1)

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| No construction necessary / Plain and ordinary meaning | Physically providing a first unit with one or more first communications hardware |

40. Claim 1 of the '437 Patent is excerpted below, with the "providing said first unit with one or more first communications hardware with associated drive routines adapted to different communications networks," language emphasized along with the further recital of the "first communications hardware":

> 1. A method of maintaining communication between a first unit and a second unit,
>
> …
>
> the method comprising the steps of:
>
> …
>
> **providing said first unit with one or more first communications hardware with associated drive routines adapted to different communications networks**;



CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

> in the event of said first unit switching from said first communications network to a third communications network, causing said first session layer to maintain said communication between said first unit and said second unit by **selecting necessary first communications hardware and drive routines** for said third communications network; and
>
> … .

’437 Patent at claim 1 (excerpt) (emphasis added). In my opinion, Dr. Polish improperly excerpts the “providing …” phrase in order to contend that “providing said first unit with one or more first communications hardware” should purportedly mean “physically providing a first unit with one or more first communications hardware.” Polish Op. Decl. at ¶ 80. By improperly excerpting the “providing…” phrase, Dr. Polish ignores the context of the claim.

41. The “providing” phrase excerpted by Dr. Polish is included in a larger phrase “providing said first unit with one or more first communications hardware **with associated drive routines adapted to different communications networks**.” ’437 Patent at claim 1 (emphasis added). Based on the plain language of this larger phrase, a POSITA would have understood the “providing” element to mean that the first unit (that has one or more first communications hardware) is provided with associated drive routines adapted to different communications networks. The ’437 Patent specification confirms this understanding by explaining the function of the drive routines respectively “belonging” to the one or more first communications hardware and are adapted to different communications networks. ’437 Patent at 5:26-33 (“In order to be able to determine which communications networks are available, the first session layer can communicate with the drive routines belonging to the first communications hardwares so as to read-out information that may be of interest in determining the capacity and characteristics of the communications networks”), *see also id.* at 10:5-11 (“[T]he first session layer 11 shall communicate with the drive routines 14a, 14b, 14c, 14d so as to be able to decide which communications networks A1, A2, A3, A4 are/is available. When the drive routines are able to determine on each occasion those communication networks that are available, this information is used.”).



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

42. Instead of looking at the context of the claims, and the specification of the ’437 Patent, Dr. Polish cites to various dictionaries to argue that “hardware” is physical equipment. Polish Op. Decl. at ¶ 81. Whether “hardware” is a physical equipment or not is irrelevant to the inquiry. The language of the claims, consistent with the descriptions in the ’437 Patent specification, make clear that it is the “associated drive routines” that are provided to the first unit, which includes one or more first communications hardware. Indeed, every first and second unit will have associated hardware. *See* ’437 Patent, Claim 1; *see also id.*, 9:4-13. But one of the focus points of the invention is on the provision of the drive routines. Indeed, the ’437 Patent specification explains how one or more communications hardware within the first unit are associated with one or more drive routines:

> FIG. 1 thus illustrates a method wherein a first unit 1 includes a first session layer 11, a first protocol stack 12, one or more first communications hardware 13*a*, 13*b*, 13*c*, 13*d* and one or more **drive routines** 14*a*, 14*b*, 14*c*, 14*d* belonging to the first communications hardwares 13*a*, 13*b*, 13*c*, 13*d*. The first session layer 11 includes a first security layer 11 a.

’437 Patent at 9:4-13 (emphasis added); *see also id.* at 5:26-33 (“In order to be able to determine which communications networks are available, the first session layer can communicate with the drive routines belonging to the first communications hardwares so as to read-out information that may be of interest in determining the capacity and characteristics of the communications networks”).

43. Dr. Polish also adds the word “physically” in his purported construction with no support from the ’437 Patent claims or specification. Polish Op. Decl. at ¶ 82. Nowhere do the ’437 Patent specification or claims use the word “physically.” Dr. Polish’s addition of the word “physically” only ambiguates the plain meaning of the claim. For example, Dr. Polish fails to provide any explanation as to whether the addition of the word “physically” requires that the “providing” step cover the physical manufacturing of the first unit or something else. If



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

Defendants and Dr. Polish intend to construe the "providing" step as encompassing and requiring "physical" manufacturing of the first unit, such a construction would improperly exclude embodiments of the '437 Patent specification. The '437 Patent describes and claims method steps for maintaining communication between a first unit and a second unit, but nowhere does the '437 Patent specification or claims use the word "physically." Thus, in my opinion, a POSITA reading Claim 1 in light of the '437 Patent specification would not have understood the claim to require a "physical" manufacturing steps.

### H. "and in that said second unit and said session layer are similar to said first unit and said first session layer, respectively" (claim 16)

| **Plaintiff's Construction** | **Defendants' Construction** |
|---|---|
| Plain and ordinary meaning | Indefinite as to "similar to" |

44. This term is used in dependent Claim 16 of the '437 Patent. For additional context, I have copied independent Claim 1 (excerpted) and Claim 16 below:

> 1. A method of maintaining communication between a **first unit** and a second unit,
>
> wherein said **first unit is comprised of a geographically mobile unit** and includes a first protocol stack adapted to act between a first communications hardware used for communication via a first communications network and one or more first software components, and . . . .
>
> the method comprising the steps of:
>
> providing said **first unit** with a first session layer which is adapted to act as an interface between said first protocol stack and said first software components;
>
> **providing said second unit** with a second session layer which is adapted to act as an interface between said second protocol stack and said second software components;
>
> ….



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

> causing said first and said second session layers to use a **common session protocol** …
>
> 16. A method according to claim 1, **wherein said second unit is also comprised of a geographically mobile unit; <u>and in that said second unit and said second session layer are similar to said first unit and said first session layer, respectively</u>**.

’437 Patent at claim 1 (excerpt) (bold emphasis added) and claim 16 (bold and underline emphasis added).

45. Dr. Polish contends “that a POSA reading claim 16 would not have understood how to determine whether the second unit and second session layer are ‘similar to’ the first unit and the first session layer, respectively.” Polish Op. Decl. at ¶ 83. I disagree because the language of Claim 1 and Claim 16 provides an objective standard for a POSITA to determine whether the first and second units are similar. Claim 1 recites that the “first unit is comprised of a geographically mobile unit,” and that the first unit and second unit each have session layers with a “common session protocol.” ’437 Patent at 14:1-4; *see also* 9:41-42 (“The first and the second session layer 11, 21 use a common session protocol … .”). Dependent Claim 16 adds that the “second unit is also comprised of a geographically mobile unit.” Claim 16 continues, “and **in that** said second unit and said second session layer are similar to said first unit and said first session layer, respectively.” (emphasis added). A POSITA would have understood that when viewed in the context of the full language of independent Claim 1 and dependent Claim 16, the two units are “similar” to one another because (“in that”) they are both “comprised of a geographically mobile unit,” and the first session layer is similar to the second session layer because, as recited in Claim 1, they both share a “common session protocol.”



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

## III. OPINIONS CONCERNING CLAIM CONSTRUCTION AND DEFINITENESS OF TERMS OF THE ’047 PATENT

### A. “establishing access at the computing device with said further network or subnetwork” (claim 1)

| Plaintiff’s Construction | Defendants’ Construction |
|---|---|
| establishing access for the computing device to said further network or subnetwork | No construction necessary / Plain and ordinary meaning |

46. Dr. Polish contends that construing the phrase “establishing access at the computing device with said further network or subnetwork” to mean “establishing access for the computing device to said further network or subnetwork” could introduce confusion as to the claim’s meaning. Polish Op. Decl. at ¶ 89. I disagree. The use of the word “at” in the claim term refers to a location, which would be nonsensical in the context of “establishing access.” A POSITA would understand that “access” refers to permission to use a certain resource and that such a permission may be given to a computing device. In the context of this claim term, the inquiry is who is given the permission and to which resource—not the ‘location’ of the permission, which would be nonsensical. The aforementioned construction clarifies which device is granted access to the “further network or subnetwork.” The context of the claims supports Plaintiff’s aforementioned construction by further reciting that the access is established “to enable **said computing device** to communicate over said further network or subnetwork.” ’047 Patent at 39:53-55 (claim 1) (emphasis added). Thus, in my opinion, a POSITA would have understood the phrase “establishing access at the computing device with said further network or subnetwork” to mean “establishing access for the computing device to said further network or subnetwork.”

47. Dr. Polish also contends that changing the word “at” to the word “for” could lead a POSITA to conclude that the computing device “would not previously have had the ability to establish access to said further network or subnetwork.” Polish Op. Decl. at ¶ 88. I disagree.



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

Nothing in Plaintiff's proposed construction precludes the computing device from being able to establish access to networks or subnetworks. Indeed, the claim language already recites when the "establishing access …" occurs. Specifically, Claim 1 recites that the "establishing access …" occurs "upon said computing device roaming while operational to a further network or subnetwork carrying IP data." '047 Patent at 39:50-51 (claim 1).

**B. "the at least one data communications network or subnet carrying IP data" / "the further data communications network or subnet" (claims 6, 7, 32, 33)**

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| the at least one data communications network or subnetwork carrying IP data / | No construction necessary / Plain and ordinary meaning / |
| the further data communications network or subnetwork | No construction necessary / Plain and ordinary meaning |

48. Dr. Polish contends that changing the word "subnet" to "subnetwork" in dependent claims 6, 7, 32, and 33 "would only ambiguate the claim term and could improperly alter the scope of the claims." Polish Op. Decl. at ¶ 94. But Dr. Polish's declaration, by referring to different dictionary definitions of "subnetwork," illustrates why clarification is indeed necessary.

49. Dr. Polish's declaration fails to consider the entirety of the claim language. While Dr. Polish cites various technical dictionaries that provide various definitions for "subnet" or "subnetwork," (*see id.* at ¶ 93), he does not consider the context of the claims. Claims 6 and 7 depend from independent Claim 1. Similarly, Claims 32 and 33 depend from independent Claim 27. As shown in the excerpts below, the antecedent basis for "***the at least one data communications network or subnet*** carrying IP data" and "***the*** further data communications network or ***subnet***" in dependent Claims 6 and 7 is provided by phrases in independent Claim 1 that use the word "subnetwork."



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

> 1. A method for enabling secure data communication with a computing device that roams among plural data communication networks or subnetworks of the type that carry Internet Protocol (IP) data, said method comprising:
>
> establishing access to **at least one data communications network or <u>subnetwork</u> carrying IP data**;
>
> using said network or subnetwork to institute secure data communications between said computing device and another computing device;
>
> upon said computing device roaming while operational to **a further network or <u>subnetwork</u>** carrying IP data, establishing access at the computing device with said further network or subnetwork to enable said computing device to communicate over said further network or subnetwork;
>
> participating in a DHCP process with **said further network or <u>subnetwork</u>**;
>
> learning, at least in part in response to said DHCP process, that said computing device is enabled to communicate over **said further network or <u>subnetwork</u>**;
>
> based at least in part on said learning, informing said another computing device that said computing device has roamed and has access to **said further network or <u>subnetwork</u>**; and
>
> using said access to **said further network or <u>subnetwork</u>** to continue said secure data communications between the computing device and said another computing device.
>
> 6. The method of claim 1 wherein **the at least one data communications network or <u>subnet</u> carrying IP data** and **the further data communications network or <u>subnet</u>** carrying IP data provide a homogeneous collection of link layer data communication networks or subnetworks.
>
> 7. The method of claim 1 wherein **the at least one data communications network or <u>subnet</u> carrying IP data** and **the further data communications network or <u>subnet</u>** carrying IP data provide a heterogeneous collection of link layer data communication networks or subnetworks.

’047 Patent at claims 1, 6, 7 (bold and underline emphasis added). Independent Claim 27 and dependent Claims 32 and 33 follow the same pattern of reciting a “subnetwork” in the independent claim and then referring to the antecedent “subnetwork” as a “subnet” in the dependent claims.



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

> 27. A method, performed by a computing device while the computing device is operational, for enabling secure data communication over at least one data communication network or subnetwork of the type that carries Internet Protocol (IP) data, said method comprising:
>
> establishing access to **at least one data communications network or <u>subnetwork</u> carrying IP data**;
>
> using **said network or <u>subnetwork</u>** access to establish secure data communications with another computing device;
>
> disassociating access from **said network or <u>subnetwork</u>**;
>
> subsequent to said disassociating step, reestablishing access to said network or subnetwork;
>
> participating in a DHCP process with **said network or <u>subnetwork</u>**;
>
> learning, at least in part in response to said DHCP process, that said computing device has reestablished access to **said network or <u>subnetwork</u>**;
>
> based at least in part on said learning, informing said another computing device of said reestablished access; and
>
> using said reestablished access to continue said secure data communications with said another computing device.
>
> 32. The method of claim 27 wherein **the at least one data communications network or <u>subnet</u> carrying IP data** comprises a homogeneous collection of link layer data communication networks or subnetworks.
>
> 33. The method of claim 27 wherein **the at least one data communications network or <u>subnet</u> carrying IP data** comprises a heterogeneous collection of link layer data communication networks or subnetworks.

’047 Patent at claims 27, 32, 33 (bold and underline emphasis added).

50. If the word “subnet” recited in the dependent claims has a different meaning than the word “subnetwork” recited in the respective independent claims, as contended by Dr. Polish, the “network or subnet” in the dependent claims would lack an antecedent basis, thereby introducing an irreconcilable ambiguity to the meaning of dependent Claims 6, 7, 32, and 33. Providing a construction to clarify that “subnet” in the dependent claims refers to the



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

"subnetwork" in the independent claims resolves this ambiguity. Moreover, such a construction is not only supported by the context of the claims, but is also consistent with usage of the terms "subnet" and "subnetwork" in the art at the time of the '047 Patent (and today). For example, at least one technical dictionary refers to the word "subnet" as "[a]n abbreviation of subnetwork." *See* Wiley Electrical and Electronics Engineering Dictionary (John Wiley & Sons, Inc., 2004) at 755 (defining subnet as "Abbreviation of subnetwork" and defining subnetwork as "A network within a larger network"). Dr. Polish also agrees that the definition of "subnet" that defines the term as "a portion of a network" is "consistent with how a POSA would understand the term subnet as used in the '047 patent." Polish Op. Decl. at ¶ 93. Thus, a construction clarifying that "subnet" in dependent claims 6, 7, 32, and 33, refers to the antecedent "subnetwork" in their respective independent claims is not only dictated by the context of the claims themselves, but is also consistent with usage of those terms in the art.

**C. "sending a discover message" (claims 8 and 34)**

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| "said computing device sending a discover message," or in the alternative, indefinite | No construction necessary / Plain and ordinary meaning |

51. Dependent Claims 8 and 34 are reproduced below along with their respective independent Claims 1 and 27.

> 1. A method for enabling secure data communication with a computing device that roams among plural data communication networks or subnetworks of the type that carry Internet Protocol (IP) data, said method comprising:
>
> establishing access to at least one data communications network or subnetwork carrying IP data;
>
> using said network or subnetwork to institute secure data communications between said computing device and another computing device;



CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

> upon said computing device roaming while operational to a further network or subnetwork carrying IP data, establishing access at the computing device with said further network or subnetwork to enable said computing device to communicate over said further network or subnetwork;
>
> **participating in a DHCP process with said further network or subnetwork**;
>
> learning, at least in part in response to said DHCP process, that said computing device is enabled to communicate over said further network or subnetwork;
>
> based at least in part on said learning, informing said another computing device that said computing device has roamed and has access to said further network or subnetwork; and
>
> using said access to said further network or subnetwork to continue said secure data communications between the computing device and said another computing device.
>
> 8. The method of claim 1 **wherein said participating includes <u>sending a discover message</u>**.

’047 Patent at claims 1, 8 (bold and underline emphasis added).

> 27. A method, performed by a computing device while the computing device is operational, for enabling secure data communication over at least one data communication network or subnetwork of the type that carries Internet Protocol (IP) data, said method comprising:
>
> establishing access to at least one data communications network or subnetwork carrying IP data;
>
> using said network or subnetwork access to establish secure data communications with another computing device;
>
> disassociating access from said network or subnetwork;
>
> subsequent to said disassociating step, reestablishing access to said network or subnetwork;
>
> **participating in a DHCP process with said network or subnetwork**;
>
> learning, at least in part in response to said DHCP process, that said computing device has reestablished access to said network or subnetwork;



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

> based at least in part on said learning, informing said another computing device of said reestablished access; and
>
> using said reestablished access to continue said secure data communications with said another computing device.
>
> 34. The method of claim 27 **wherein said participating includes <u>sending a discover message</u>**.

'047 Patent at claims 27, 34 (bold and underline emphasis added).

52. For example, in the context of claim 1 and its dependents, the claims fail to specify which device is "sending a discover message." It is entirely unclear which of the "said computing device," "another computing device," "said network or subnetwork" or the "further network or subnetwork" is "sending a discover message."

53. Dr. Polish contends that the specification provides guidance as to the scope of "sending a discover message." Polish Op. Decl. at ¶ 97. Specifically, Dr. Polish cites the following passage from the '047 Patent specification:

> The preferred embodiment uses standard DHCP Discover/Offer client-server broadcast messaging sequences as an echo request-response, along with other standard methodologies in order to determine if a Mobile End System **104** has roamed to a new subnet or is out of range. In accordance with the standard DHCP protocol, **a Mobile End System 104 requiring a network address will periodically broadcast client identifier and hardware address as part of a DHCP Discover message**.

'047 Patent at 34:21-29 (emphasis added) (quoted by Polish Op. Decl. at ¶ 97). Dr. Polish goes on to state that "[b]ased on the above passage from the specification, together with the fact that the plain language of the claims requires 'sending a discover message' to be part of 'participating in a DHCP process,' a POSA would readily understand that the 'discover message' of claims 8 and 34 refers to a 'DHCP Discover message.' This is the plain and ordinary meaning of the claim term read in context, and no further construction is necessary or appropriate." Polish Op. Decl. at ¶ 97. The Mobile End System 104 highlighted by Dr. Polish corresponds to the "said computing device" (as opposed to the "another computing device") recited in the respective



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

independent Claims 1 and 27. For example, it is the Mobile End System 104 that acquires a network address from participating in the DHCP process in order to gain network access. *See, e.g.*, ’047 Patent at 34:10-12 (“Thus, when a Mobile End System 104 using DHCP roams from one subnet to another, it will appear with a new network address.”). Accordingly, a POSITA would have understood that the “said computing device” (as opposed to the “another computing device”) recited in independent Claims 1 and 27 is what performs the step of “sending a discover message” as recited in dependent Claims 8 and 34 respectively. Dr. Polish appears to agree. *See* Polish Op. Decl. at ¶ 97. Otherwise, the claims would, in my opinion, be indefinite for failing to inform a POSITA with reasonable certainty what component of the claims performs the recited “sending a discover message” step. In view of the foregoing, a POSITA would have understood “sending a discover message” to mean “said computing device sending a discover message.”

**D. “participating in a DHCP process with said further network or subnetwork” / “participating in a DHCP process with said network or subnetwork” (claims 1, 27)**

| Plaintiff’s Construction | Defendants’ Construction |
|---|---|
| “said computing device participating in a DHCP process with said further network or subnetwork” / “said computing device participating in a DHCP process with said network or subnetwork,” or in the alternative, indefinite | No construction necessary / Plain and ordinary meaning |

54. Claims 1 and 27 are reproduced below with the respective “participating” steps emphasized.

> 1. A method for enabling secure data communication with a computing device that roams among plural data communication networks or subnetworks of the type that carry Internet Protocol (IP) data, said method comprising:
>
> establishing access to at least one data communications network or subnetwork carrying IP data;



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

> using said network or subnetwork to institute secure data communications between said computing device and another computing device;
>
> upon said computing device roaming while operational to a further network or subnetwork carrying IP data, establishing access at the computing device with said further network or subnetwork to enable said computing device to communicate over said further network or subnetwork;
>
> **participating in a DHCP process with said further network or subnetwork**;
>
> learning, at least in part in response to said DHCP process, that said computing device is enabled to communicate over said further network or subnetwork;
>
> based at least in part on said learning, informing said another computing device that said computing device has roamed and has access to said further network or subnetwork; and
>
> using said access to said further network or subnetwork to continue said secure data communications between the computing device and said another computing device.

’047 Patent at claims 1 (emphasis added).

> 27. A method, performed by a computing device while the computing device is operational, for enabling secure data communication over at least one data communication network or subnetwork of the type that carries Internet Protocol (IP) data, said method comprising:
>
> establishing access to at least one data communications network or subnetwork carrying IP data;
>
> using said network or subnetwork access to establish secure data communications with another computing device;
>
> disassociating access from said network or subnetwork;
>
> subsequent to said disassociating step, reestablishing access to said network or subnetwork;
>
> **participating in a DHCP process with said network or subnetwork**;
>
> learning, at least in part in response to said DHCP process, that said computing device has reestablished access to said network or subnetwork;



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

> based at least in part on said learning, informing said another computing device of said reestablished access; and
>
> using said reestablished access to continue said secure data communications with said another computing device.

’047 Patent at claim 27 (emphasis added).

55. Dr. Polish contends that a POSITA “would have understood how to use DHCP as a process for automatically configuring network devices on a subnet, as well as how to participate in such a process.” Polish Op. Decl. at ¶ 101. Specifically, Dr. Polish cites the following passage from the ’047 Patent specification:

> **It is common to use a Dynamic Host Configuration Protocol (DHCP) to automatically configure network devices that are newly activated on such a subnet.** For example, a DHCP server on the sub-net typically provides its clients with (among other things) a valid network address to “lease”. DHCP clients may not have permanently assigned, “hard coded” network addresses. Instead, at boot time, the DHCP client requests a network address from the DHCP server. The DHCP server has a pool of network addresses that are available for assignment. When a DHCP client requests [a] network address, the DHCP server assigns, or leases, an available address from that pool to the client. The assigned network address is then “owned” by the client for a specified period (“lease duration”). When the lease expires, the network address is returned to the pool and becomes available for reassignment to another client. **In addition to automatically assigning network addresses, DHCP also provides netmasks and other configuration information to clients running DHCP client software.**

’047 Patent at 33:56-34:7 (emphasis added) (quoted by Polish Op. Decl. at ¶ 101).

56. The “network devices” highlighted by Dr. Polish corresponds to the “said computing device” (as opposed to the “other computing device”) recited in the respective independent Claims 1 and 27. It is these “network devices” described in the specification that acquire network addresses from participating in the DHCP process in order to gain network access. *See* ’047 Patent at 33:56-34:7. Accordingly, a POSITA would have understood that the “said computing device” (as opposed to the “another computing device”) recited in independent Claims 1 and 27 is what performs the steps of “participating in a DHCP process with said further



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

network or subnetwork" (Claim 1) or "participating in a DHCP process with said further network or subnetwork" (Claim 27) as recited in the respective claims. Otherwise, the Claims 1 and 27 would, in my opinion, be indefinite for failing to inform a POSITA with reasonable certainty what component of the claims performs the recited "participating" step. In view of the foregoing, a POSITA would understand "participating in a DHCP process with said further network or subnetwork" / "participating in a DHCP process with said network or subnetwork" to mean "said computing device participating in a DHCP process with said further network or subnetwork" / "said computing device participating in a DHCP process with said network or subnetwork."

### E. "moves from one type of connection to another" (claim 25)

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| "moves from a wireless connection to a non-wireless connection, or vice versa," or in the alternative, indefinite | No construction necessary / Plain and ordinary meaning |

57. Claim 25 is reproduced below along with an excerpt of its independent Claim 1:

> 1. A method for enabling secure data communication with a computing device that roams among plural data communication networks or subnetworks of the type that carry Internet Protocol (IP) data, said method comprising: … .
>
> 25. The method of claim 1 wherein said computing device **moves from one type of connection to another** during roaming.

'047 Patent at claim 1 (excerpt) and Claim 25 (emphasis added).

58. Dr. Polish contends that passages from the '047 Patent specification clearly indicate that roaming could involve moving between two types of non-wireless connections. Polish Op. Decl. at ¶ 106. Dr. Polish cites column 37, lines 36-53 of the '047 Patent specification, which describes an example of an employee connecting to an office LAN via Ethernet in the office and later at home "reconnect[ing] to the office LAN via a dialup connection and/or over the Internet." *Id.* (citing '047 Patent at 37:36-53). However, this passage does not



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

refer to moving from one "type" of connection to another. The *only* place where the '047 Patent specification explains what it means to "move[] from one *type* of connection to another" sets up the distinction in "type" of connection based on whether the "type of connection" is "wire-based" or not.

> In another example, Mobile End Systems 104 may move from one ***type*** of connection to another (e.g., from being connected to Mobility Management Server 102 via ***wire-based*** interconnect 109 to being ***connected via network 111***, or vice versa)—its connection being temporarily broken during the time it is being moved from one connection to another.

'047 Patent at 8:17-23 (emphasis added). As noted by Dr. Polish, the above passage includes "e.g." Polish Op. Decl. at ¶ 106. Nonetheless, this passage is the only place in the specification that refers specifically to a "***type*** of connection," and is the only place in the specification that illustrates what the distinction in "type" is based upon in the recited claim language. Accordingly, when reading Claim 25[3] in light of the '047 Patent Specification, a POSITA would have understood the claim term "moves from one type of connection to another" to mean "moves from a wireless connection to a non-wireless connection, or vice versa." Otherwise, the claim would be indefinite because a POSITA would not have understood what a "type of connection" and "another [type of connection]" mean.

**F. "session priorities" (claims 23, 48)**

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| values maintained at a server and indicating relative importance of one session compared to another session | No construction necessary / Plain and ordinary meaning |

59. Claims 23 and 48 of the '047 Patent are reproduced below, with the term "session priorities" emphasized:

> 23. The method of claim 1 further including providing configurable **session priorities** for said computing device and/or users thereof.

[3] Claim 50 of the '047 Patent recites the same "moves from one type of connection to another" language as recited in Claim 25, and thus should be construed in the same manner for the same reasons described above for Claim 25.



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

> 48. The method of claim 27 further including providing configurable **session priorities** for said computing device and/or users thereof.

’047 Patent at claims 23, 48 (emphasis added).

60. As I explained in Paragraphs 71-74 of my opening declaration dated February 27, 2023, a POSITA would have understood the term “session priorities” in the context of the ’047 Patent to be values maintained at a server and indicating relative importance of one session compared to another session. Dr. Polish contends that “[n]othing in the ’047 Patent requires the session priorities to be maintained at a server, as opposed to, for example, on a mobile device.” Polish Op. Decl. at ¶ 108. However, Dr. Polish cites no evidence from the ’047 Patent specification or otherwise to support the notion that “session priorities” could be maintained at the mobile device. *See id.* To the contrary, the ’047 Patent specification indicates that “session priorities” are maintained at a server in order to provide centralized management of traffic from different mobile devices with different priorities:

> A presently preferred exemplary embodiment of the present invention also provides the following (among others) new and advantageous techniques and arrangements: a **Mobility Management Server, providing user configurable session priorities for mobile clients**; …

’047 Patent at 3:10-14 (emphasis added);

> In accordance with yet another aspect of a presently preferred exemplary embodiment of the present invention, a **Mobility Management Server provides centralized system management of Mobile End Systems** through a console application and exhaustive metrics. A presently preferred exemplary embodiment of the present invention also provides user configurable **session priorities for mobile clients running through a proxy server**, and per-user mobile policy management for managing consumption of network resources.

*Id.* at 3:54-65 (emphasis added). Even the passage cited by Dr. Polish refers to the “priority levels” being facilitated by the proxy server function of Mobility Management Server 102:



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

> The proxy server function provided by **Mobility Management Server 102** allows for different **priority levels** for network applications, users and machines.

*Id.* at 10:38-40 (emphasis added) (quoted by Polish Op. Decl. at ¶ 108).

61. Dr. Polish also contends that construing "session priorities" to be "values maintained at a server and indicating relative importance of one session compared to another session" would confuse a POSITA by making priorities ambiguous. Polish Op. Decl. at ¶ 109. I disagree. The '047 Patent specification explains that the server allows certain applications (e.g., real-time applications) to have greater access to the server's resources than other less demanding applications.

> The proxy server function provided by **Mobility Management Server 102** allows for different **priority levels** for network applications, users and machines. … As one example, the system manager can configure Mobility Management Server 102 to allow real time applications such as streaming audio or video to have greater access to the Mobility Management Server 102's resources than other less demanding applications such as email.

'047 Patent at 10:38-49 (emphasis added) (quoted by Polish Op. Decl. at ¶ 108). In other words, the server will prioritize applications depending on the relative importance of handling data in real time (e.g., for streaming audio or video) as compared to less time-sensitive applications (e.g., email). *See* '047 Patent at 10:38-49. Indeed, as I explained in paragraph 73 of my opening declaration dated February 27, 2023, such prioritization based on the importance of the data was well known in the art. For example, the Data Networks textbook by Dimitri P. Bertsekas and Robert G. Gallager published in 1992 explains that different communication sessions may have different levels of importance based on the type of data being communicated in a given session.

> Note that different sessions may have radically different service requirements. For example, sessions transferring files may tolerate considerable delay but may require strict error control, while voice and video sessions may have strict minimum data rate and maximum end-to-end delay requirements, but may tolerate occasional packet losses.



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

D. Bertsekas et al., *Data Networks* (Prentice Hall Inc. 2d ed., 1992) at 494. Thus, to manage traffic flow at a server, for example, different priority values may be assigned to different sessions depending on the relative importance of the data associated therewith.

> We mentioned earlier that for important classes of sessions, such as voice and video, packets that are excessively delayed are useless. For such sessions, a limited delay is essential and should be one of the chief concerns of the flow control algorithm; for example, such sessions may be given high priority.

*Id.* at 496.

62. Accordingly, based on the descriptions of "session priorities" in the '047 Patent specification, and the POSITA's understanding of how such session priorities operate to manage the flow of communications traffic, in the context of the '047 Patent a POSITA would have understood the term "session priorities" to be values maintained at a server and indicating the relative importance (i.e., the relative priority) of one session compared to another session.

### G. "maintaining a virtual address associated with said computing device" (claim 49)

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| maintaining a constant virtual address associated with said computing device | No construction necessary / Plain and ordinary meaning |

63. Claims 49 of the '047 Patent is reproduced below, with the "maintaining" phrase emphasized:

> 49. The method of claim 27 wherein the point of presence address of said computing device changes during roaming, and wherein said method further including **maintaining a virtual address associated with said computing device** constant at least during roaming.

'047 Patent at claims 49 (emphasis added).

64. The plain language of Claim 49 dictates that the virtual address maintained during roaming is a "constant" virtual address. Nonetheless, Dr. Polish contends that construing the



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

phrase "maintaining a virtual address associated with said computing device" to mean "maintaining a constant virtual address associated with said computing device" would confuse a POSITA because the word constant "could be interpreted to require the virtual address to be maintained in perpetuity." Polish Op. Decl. at ¶ 112. I disagree with Dr. Polish. The word "constant" is already included within the context of Claim 49. Moreover, nothing in the aforementioned construction alters the later designation in Claim 49 that this "maintaining" step occurs "at least during roaming."

**H. "network medium" (claim 53)**

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| the material substance on which network signals are transmitted | No construction necessary / Plain and ordinary meaning |

65. Claim 53 of the '047 Patent is reproduced below, with the term "network medium" emphasized:

> 53. A method for allowing a mobile computing device to roam across IP-based networks, comprising:
>
> connecting the mobile computing device to at least one **network medium** used for data communications;
>
> using a network layer address to facilitate secure IP-based data communications including application and/or transport layer sessions between said mobile computing device and another computing device at least in part via said **network medium**;
>
> then connecting the mobile computing device to a further **network medium** without first rebooting said mobile computing device;
>
> performing a DHCP process over said further **network medium**;
>
> discovering, based at least in part on said DHCP process, that said mobile computing device has roamed; and



CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

> based at least in part on said discovering, using a further network layer address to continue said secure IP-based data communications between said mobile computing device and said another computing device without terminating application and transport layer sessions therebetween.

’047 Patent at claim 53 (emphasis added). As I explained in paragraphs 75-77 of my opening declaration dated February 27, 2023, a POSITA would have understood the term “network medium” to mean “the material substance on which network signals are transmitted.”

66. Dr. Polish contends that a POSITA “would know that a network medium does not have to be a ‘material substance,’” and that it was allegedly “well-known that radio waves constituted a network medium at the time of the patent.” Polish Op. Decl. at ¶ 115. But, Dr. Polish cites no evidence for what he alleges was “well-known” in the art. *See id.* Instead, Dr. Polish improperly cites the ’047 Patent specification. For example, Dr. Polish contends that “the specification lists ‘conventional electromagnetic (e.g., radio frequency) transceivers’ as a medium for communicating with ‘wireless (or wire-line) local area or wide area network[s].’” Polish Op. Decl. at ¶ 116 (citing ’047 Patent at 7:59-62). But as shown below, the cited passage of the ’047 Patent specification never uses the word “medium,” much less identify “conventional electromagnetic (e.g., radio frequency) transceivers” (or radio waves transmitted by those transceivers) as a medium:

> Some Mobile End Systems 104 a-104 k may communicate with Mobility Management Server 102 via a mobile interconnect (wirelessly in this case), e.g., conventional electromagnetic (e.g., radio frequency) transceivers 106 coupled to wireless (or wire-line) local area or wide area network 108.

’047 Patent at 7:57-62.

67. Transceivers are devices that either (i) transmit a signal (e.g., a radio wave) across a medium, or (ii) receive a signal that has been transmitted across a medium. *See* Newton’s Telecom Dictionary (Miller Freeman, Inc. 14th ed, 1998), at 738 (defining “transceiver” as “[a]ny device that transmits and receives”); *see also See* Newton’s Telecom Dictionary (Miller Freeman,



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

Inc. 15th ed, 1999), at 811 (same). By contrast, a medium in the context of the ’047 Patent is the material substance (e.g., optical fiber, cable, wire, air or free space) on which the signals are transmitted. For the wireless signals transmitted by the “conventional electromagnetic (e.g., radio frequency) transceiver” referenced by Dr. Polish, the “network medium” across which the signals are transmitted would simply be air or free space. Such an understanding in the context of the ’047 Patent is consistent with how Telecommunications and Computer dictionaries define a “medium” in the context of networking. For example, Newton’s Telecom Dictionary (Miller Freeman, Inc. 14th ed, 1998) provides the following definition for “medium”:

> Any material substance that can be used for the telecommunications transmission of signals. “Mediums” (or media) include optical fiber, cable, wire, dielectric slab, water, air or free space.

*Id.* at 443; *see also* Newton’s Telecom Dictionary (Miller Freeman, Inc. 15th ed, 1999) at 488. As another example, the Microsoft Press Computer Dictionary (Microsoft Press 3rd ed., 1997) provides the following definition of “medium”:

> A substance in which signals can be transmitted, such as a wire or fiber-optic cable.

*Id.* at 301. Accordingly, a POSITA would have understood the term “network medium” as recited in Claim 53 to be the material substance on which network signals are transmitted.

### I. “learning, at least in part in response to said DHCP process” (claims 1, 27, 54, 55)

| Plaintiff’s Construction | Defendants’ Construction |
|---|---|
| learning, at least in part in response to analysis of information received during said DHCP process | No construction necessary / Plain and ordinary meaning |



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

68. Dr. Polish contends that the phrase "learning, at least in part in response to said DHCP process" should not be construed to mean "learning, at least in part in response to analysis of information received during said DHCP process." Polish Op. Decl. at ¶ 120. Dr. Polish contends that such a construction would transform the claim by allegedly introducing a new "analysis" step. Polish Op. Decl. at ¶ 120. I disagree with Dr. Polish because, in the context of the '047 Patent, the recited "learning" is the result of an analysis of the information (e.g., a network address) received during the DHCP process, not a separate and distinct step. As I explain in detail below, the recited "learning" cannot be done without analysis of the information received during the DHCP process. The "analysis" in Plaintiff's construction is therefore a necessary aspect of the respective "learning" steps recited in Claims 1, 27, 54, and 55, and not a separate step.

69. Each of Claims 1, 27, 54, 55 recite "learning, at least in part in response to said DHCP process." *See* '047 Patent at claims 1, 27, 54, 55. As I explained in Paragraphs 58-65 of my opening declaration dated February 27, 2023, in each instance, the "learning, at least in part in response to said DHCP process" involves learning that the "computing device" (or "mobile computing device") has either (i) reestablished access to said network or subnetwork, or (ii) is enabled to communicate over a *further* network or subnetwork (i.e., has roamed to a further network or subnetwork), based on the result of analysis (e.g., evaluation and/or examination) of the information received during the DHCP process. *See* '047 Patent at claims 1, 27, 54, 55. Thus, a POSITA would have understood that "learning, at least in part in response to a DHCP process" means that the learning occurs, not just based on the fact that a DHCP process has occurred, but rather based on the result of analysis (e.g., evaluation and/or examination) of information received during the DHCP process. Indeed, Dr. Polish fails to point out any "learning" that is done, or can be done, by embodiments of the '047 Patent specification based on the DHCP process without analysis of the results of that DHCP process (i.e., analysis of information received during the DHCP process).



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

70. Dr. Polish is wrong to contend that the inclusion of "analysis" in Plaintiff's construction would transform the claim by adding an extra step to the "learning" recited in Claims 1, 27, 54, and 55. A POSITA reading the '047 Patent would understand that nothing is learned just from the occurrence of the DHCP process alone. Rather, the embodiments of the '047 Patent learn from the outcome of the DHCP process (i.e., from analysis of the information received during the DHCP process). The "analysis" is necessary for the "learning" to occur, and therefore is not a separate transformative step. Dr. Polish cannot and does not point to any portion of the '047 Patent specification to explain how the embodiments disclosed therein would learn that the "computing device" (or "mobile computing device") has either (i) reestablished access to said network or subnetwork, or (ii) is enabled to communicate over a *further* network or subnetwork (i.e., has roamed to a further network or subnetwork), without analysis of the results of that DHCP process (i.e., analysis of information received during the DHCP process).

71. The example embodiments recited in dependent Claims 9 and 11 further disprove Dr. Polish's contention that inclusion of "analysis" in Plaintiff's construction would add an extra step. Indeed, examples of analysis recited in Claims 9 and 11 illustrate how analysis is part of the "learning" step, not a separate distinct step.

> 9. The method of claim 1 wherein said learning **compares a network address** dynamically provided by DHCP with a previously-used network address, and **determines whether said addresses are different**.
>
> 11. The method of claim 1 wherein said **learning includes detecting**, based on a network address that is dynamically provided by said DHCP process, **that said computing device's network point of attachment has changed**.

'047 Patent at claims 9 and 11 (emphasis added). For example, dependent Claim 9 recites that the learning step of independent Claim 1 "*compares*" the network address provided by DHCP and "*determines*" whether said addresses are different. *Id.* at claim 9 (emphasis added).[4] The comparison and determination recited in dependent Claim 9 are an example of analysis that is

[4] Dependent Claim 35 depends from Claim 27, but otherwise follows the same format of dependent Claim 9.



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

part of the "learning" step recited in independent Claim 1, not separate and distinct steps. As another example, Claim 11 explicitly recites that the "learning" step of independent Claim 1 "*includes* detecting, based on a network address … provided by said DHCP process, that said computing device's network point of attachment has changed." *Id.* at claim 11 (emphasis added).[5] Again, this "detecting" based on a network address provided by said DHCP (i.e., information received during the DHCP process) is an example of analysis that is part of the "learning" step recited in independent Claim 1, not a separate and distinct step.

72. Dr. Polish also argues that the construction's inclusion of the word "analysis" adds an allegedly "unsupported method step" because the specific word "analysis" does not appear in the patent disclosure. Polish Op. Decl. at ¶ 122. But Dr. Polish's view is untenable. For example, under Dr. Polish's view, the entirety of the "learning" step recited in Claims 1, 27, 54, and 55 would likewise be, in Dr. Polish's words, "unsupported," because the word "learning" (or any form of the base word "learn") is also absent from the '047 Patent specification.

73. In my opinion, a POSITA would have understood the phrase "learning, at least in part in response to said DHCP process" to mean "learning, at least in part in response to analysis of information received during said DHCP process." As I explained in paragraphs 58-65 of my opening declaration dated February 27, 2023, such a construction broadly encompasses the alleged inventive concept of Claims 1, 27, 54, and 55 of the '047 Patent, including but not limited to the example embodiments disclosed in the specification (*see, e.g.*, "Roaming Control" section starting at 33:41 of the '047 Patent specification), as well as the example embodiments recited in dependent Claims 9 and 11 (and dependent Claims 35 and 37). Thus, construing "learning, at least in part in response to said DHCP process" to mean "learning, at least in part in response to analysis of information received during said DHCP process" is fully supported by both the specification of the '047 Patent as well as the context of the claims.

[5] Claim 37 depends from Claim 27, but follows the same format of Claim 11 with the exception that was is detected is that a "network point of attachment has *not* changed" instead that a "network point of attachment has changed."



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

**J. "detecting, based on a network address that is dynamically provided by said DHCP process" (claim 11, 37)**

| **Plaintiff's Construction** | **Defendants' Construction** |
|---|---|
| detecting, based on an analysis of network address that is dynamically provided by said DHCP process | No construction necessary / Plain and ordinary meaning |

74. Dr. Polish contends that the phrase "detecting, based on a network address that is dynamically provided by said DHCP process" should not be construed to mean "detecting, based on an analysis of network address that is dynamically provided by said DHCP process." Polish Op. Decl. at ¶¶ 125-127. Like the dispute discussed above in Section III.I regarding the construction of "learning, at least in part in response to said DHCP process," Dr. Polish contends that such a construction would introduce a new "analysis" step. Polish Op. Decl. at ¶¶ 125-126. I disagree with Dr. Polish for the same reasons discussed above in Section III.I, which I incorporate here as well. In the context of the '047 Patent, the recited "detecting" is the result of an analysis of the information (e.g., analysis of the network address) provided by the DHCP process, and not a separate and distinct step.

75. Dependent Claims 11 and 37 depend from Claims 1 and 27 respectively, and are reproduced below with the "detecting" emphasized.

> 11. The method of claim 1 wherein said learning includes **detecting, based on a network address that is dynamically provided by said DHCP process**, that said computing device's network point of attachment has changed.
>
> 37. The method of claim 27 wherein said learning includes **detecting, based on a network address that is dynamically provided by said DHCP process**, that a network point of attachment has not changed.

'047 Patent at claims 11 and 37 (emphasis added). As shown above, the "detecting" in dependent Claims 11 and 37 is recited as being included within the "learning" step of the respective independent Claims 1 and 27. Thus, for the same reasons I describe above in Section III.I with



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

respect to the "learning" step recited in independent Claims 1 and 27, a POSITA would have understood that "detecting, based on a network address that is dynamically provided by said DHCP process" means that the detecting occurs, not just based on the fact that a DHCP process has happened, but rather based on the result of analysis (e.g., evaluation and/or examination) of information (e.g., a network address) provided by the DHCP process. *See supra* Section III.I.

### K. "determining, based at least in part on a DHCP process" (claim 52)

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| determining, based at least in part on an analysis of information received during a DHCP process | No construction necessary / Plain and ordinary meaning |

76. Dr. Polish contends that the phrase "determining, based at least in part on a DHCP process" should not be construed to mean "determining, based at least in part on an analysis of information received during a DHCP process." Polish Op. Decl. at ¶¶ 129-131. Like the dispute discussed above in Section III.I regarding the construction of "learning, at least in part in response to said DHCP process," Dr. Polish contends that such a construction would introduce a new "analysis" step. Polish Op. Decl. at ¶¶ 129-130. I disagree with Dr. Polish for the same reasons I discuss above in Section III.I, which I incorporate here as well. In the context of the '047 Patent, the recited "determining" is the result of an analysis of the information (e.g., a network address) provided by the DHCP process, and not a separate and distinct step.

77. Dr. Polish also contends that the aforementioned construction is improper because such a construction would allegedly mean that the recited "determining," in Dr. Polish's words, "may **only** be based on an 'analysis of information received during the DHCP process.'" Polish Op. Decl. at ¶¶ 131 (emphasis added). I disagree with Dr. Polish because his contention does not comport with the actual words of the proposed construction. The words of the proposed construction make it clear that the determining is based "at least in part" (as opposed to "only")



CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

on an analysis of information received during a DHCP process. The proposed construction therefore leaves open the option that the recited "determining" may *also* be based in part on other considerations.

**L. "discovering, based at least in part on said DHCP process" (claim 53)**

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| discovering, based at least in part on an analysis of information received during said DHCP process | No construction necessary / Plain and ordinary meaning |

78. Dr. Polish contends that the phrase "discovering, based at least in part on said DHCP process" should not be construed to mean "discovering, based at least in part on an analysis of information received during said DHCP process." Polish Op. Decl. at ¶¶ 133-135. Like the dispute discussed above in Section III.I regarding the construction of "learning, at least in part in response to said DHCP process," Dr. Polish contends that such a construction would introduce a new "analysis" step. Polish Op. Decl. at ¶¶ 133-134. I disagree with Dr. Polish for the same reasons discussed above in Section III.I, which I incorporate here as well. In the context of the '047 Patent, the recited "discovering" is the result of an analysis of the information (e.g., a network address) received during the DHCP process, and not a separate and distinct step.

**M. "a listener that participates in a DHCP process with said further network or subnetwork" (claim 54)**

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| Indefinite<br>(governed by 35 U.S.C. § 112(6))[6]<br>Function: "participates in a DHCP process with said further network or subnetwork"<br>Structure: None | No construction necessary / Plain and ordinary meaning / not governed by 35 U.S.C. § 112(6) |

[6] I have been provided by counsel both Plaintiff's and Defendants' proposed constructions, which are reproduced herein for each term on which I opine. I have been informed by counsel that



CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

79. Dr. Polish contends that a POSITA would understand that the term "listener" is a structural term, not a functional term. Polish Op. Decl. at ¶ 137. I disagree with Dr. Polish. Neither the specification of the '047 Patent, nor the extrinsic evidence cited by Dr. Polish, show that a POSITA would have understood the word "listener" to have a sufficiently definite meaning as a name for structure.

80. Dr. Polish cites to "listener data structures" in Figure 16 of the '047 Patent specification as alleged evidence that a "listener" is structural. *See* Polish Op. Decl. at ¶¶ 139-140 (citing '047 Patent at 35:55-62, 34:37-43, 35:12-25, Fig. 16). However, the '047 Patent explains that a "listener data structure" is merely a set of data (i.e., information) that is updated by the functional "listener process." *See e.g.*, '047 Patent at 34:37-40, 34:59-60. For example, the '047 Patent explains that the invention "provides DHCP listeners to monitor the DHCP broadcast messages and thereby ascertain whether a particular Mobile End System 104 has roamed … ." '047 Patent at 34:37-40. The '047 Patent goes on to explain that DHCP listener data structures (as shown in Figure 16) "are continually updated based on DHCP broadcast traffic" appearing on the network. *Id.* at 34:59-60. Thus, a POSITA would have understood that the "DHCP listener data structures" shown in Figure 16 are merely data updated as part of a listener function or process. Indeed, the '047 Patent describes various functions that are used to update the data maintained in the so-called "DHCP listener data structures" of Figure 16:

> The following example functions can be used to maintain these data structures:
>
> roamCreate( ) [initialize variables]
>
> roamDeinitialize( ) [delete all listeners]
>
> roamStartIndications( ) [call a supplied callback routine when a

---

Plaintiff interprets certain terms under 35 U.S.C. § 112(6). I am not an attorney, I do not opine on matters of law, and I do not provide legal opinions regarding 35 U.S.C. § 112(6). I have been asked by counsel to consider and respond to Dr. Polish's opinions regarding whether certain terms are structural or functional in nature. I have also been asked by counsel to consider, in response to Dr. Polish's opinions, whether the functional language recited in certain terms is linked to any particular structure disclosed in the '047 Patent specification.



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

> Mobile End System has roamed or changed interfaces, to give a registrant roaming indications]
>
> roamStopIndications( ) [remove the appropriate callback from the list, to stop giving a registrant roaming indications]
>
> Interface Change [callback notification from operating system indicating an interface has changed its network address]
>
> Listener Signal [per-interface callback from a Listener indicating a roaming or out-of-range or back-in-range condition].

’047 Patent at 34:60-35:9 (bracketed text in original).

81. Moreover, Dr. Polish fails to acknowledge the fact that the ’047 Patent itself refers to a “listener” as a function or a “process.”

> **FIG. 17 is a flowchart of example steps of a <u>Listener process</u>** of the preferred embodiment. Referring to FIG. 17, a DHCP listener process is created by allocating appropriate memory for the handle, opening NAL sockets for the DHCP client and server UDP ports, and setting receive callbacks for both. A timer is then set (block 802) and then the process enters the “Wait” state to wait for a roaming related event (block 804).

’047 Patent at 35:63-36:3 (bold and underline emphasis added). Fig. 17, for example, is a flow chart illustrating a series of functional decision blocks included within the “listener” process.



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900



Fig. 17

’047 Patent at Figure 17; *see also id.* at Figures 17A and 18. “When the **listener process** of FIG. 17 signals (block 862), the process determines whether the signal indicates a ‘roam’, ‘out of range’ or ‘back in range’ condition (decision block 864, 870, 874).” *Id.* at 37:16-19 (emphasis added). Thus, contrary to Dr. Polish’s contention, a POSITA would not have understood the word “listener,” as used in the ’047 Patent, to have a sufficiently definite meaning as the name for structure.

82. I also disagree with Dr. Polish’s contention that “publications show that a POSAs (sic) would have already known ‘a listener’ to be a structural term at the time of the ’047 Patent.” *See* Polish Op. Decl. at ¶ 142. None of the publications cited by Dr. Polish support Dr. Polish’s conclusion. For example, the third and fourth editions of the Douglas E. Comer textbook entitled “Internetworking with TCP/IP Vol. 1: Principles, Protocols, and Architecture” refer to a “listen” function. *See* Douglas E. Comer, Internetworking with TCP/IP Vol. 1 Principles, Protocols, and



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

Architectures (4th ed. 2000)) at 424 ("The function *listen* allows servers to prepare a socket for incoming connections.") (emphasis in original), 424 ("[A] server process uses the functions *socket*, *bind*, and *listen* to create a socket … .") (emphasis in original); *see also* Douglas E. Comer, Internetworking with TCP/IP Vol. 1: Principles, Protocols, and Architecture (3d ed. 1995)), at 346 ("a server process uses the system calls *socket*, *bind*, and *listen* to create a socket … .") (emphasis in original). The only other publication cited by Dr. Polish similarly refers to the word "listen" as a function performed by processes. *See* Andrew S. Tanenbaum, Computer Networks (3d ed. 1996) at 489 ("The method normally used is to define transport addresses to which *processes can listen* for connection requests") (emphasis added), 510 ("When a process wants to be able to accept incoming calls, it calls *listen*, specifying a particular TSAP to listen to. … One side is passive, executing a *listen* and waiting until something happens.") (emphasis in original). Moreover, none of the extrinsic materials cited by Dr. Polish refer to the "listen" function in the context of participating in a DHCP process. Thus, contrary to Dr. Polish's contention, a POSITA at the time of the '047 Patent would not have understood the word "listener," to have a sufficiently definite meaning as the name for structure.

83. Moreover, the '047 Patent specification does not disclose sufficient structure linked to the function of "participat[ing] in a DHCP process with said further network or subnetwork." Dr. Polish cites to the "listener data structures" of Figure 16 as alleged "structures." Polish Op. Decl. at ¶¶ 139-140 (citing '047 Patent at 35:55-62, 34:37-43, 35:12-25, Fig. 16). But, as I explain above, the '047 Patent explains that a "listener data structure" is merely a set of data (i.e., information) that is updated by the functional "listener process." *See e.g.*, '047 Patent at 34:59-60. For example, the '047 Patent explains that DHCP listener data structures (as shown in Figure 16) "are continually updated based on DHCP broadcast traffic" appearing on the network. *Id.* at 34:59-60. Thus, a POSITA would have understood that the "DHCP listener data structures" shown in Figure 16 are merely data updated as part of a listener



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

function or process. A POSITA would have understood that data is not "structure," (e.g., physical structure) and data alone cannot participate in a DHCP process with said further network or subnetwork. Therefore, the function of "participat[ing] in a DHCP process with said further network or subnetwork" is not linked to any particular sufficient "structure" in the '047 Patent. Indeed, as I describe above, the '047 Patent describes the "listener" in terms of a function or a "process." *See* '047 Patent, 35:63-36:3 ("FIG. 17 is a flowchart of example steps of a **Listener process** of the preferred embodiment."), Fig. 17 (illustrating a series of functional decision blocks included within the "listener" process).

**N. "a detector coupled to said listener, said detector learning, at least in part in response to said DHCP process, that said mobile computing device is enabled to communicate over said further network or subnetwork and, based at least in part on said learning, using said access to said further network or subnetwork to continue said secure data communications between the mobile computing device and said another computing device" (claim 54)**

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| Indefinite<br>(governed by 35 U.S.C. § 112(6))[7]<br>Function: "learning, at least in part in response to said DHCP process, that said mobile computing device is enabled to communicate over said further network or subnetwork and, based at least in part on said learning, using said access to said further network or subnetwork to continue said secure data communications between the mobile computing device and said another computing device"<br>Structure: None | No construction necessary / Plain and ordinary meaning / not governed by 35 U.S.C. § 112(6) |

84. Dr. Polish contends that a POSITA would understand that the term "detector" in the context of network communications and specifically in the context of the '047 Patent was a structural term, and not a functional term. Polish Op. Decl. at ¶ 146. I disagree with Dr. Polish.

[7] *See supra* Section III.M, footnote 6.



CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

Neither the specification of the ’047 Patent, nor the extrinsic evidence cited by Dr. Polish, show that a POSITA would have understood the word “detector” to have a sufficiently definite meaning as a name for structure.

85. Dr. Polish first contends that a POSITA “would recognize that a listener is a data structure,” and thus “a detector ‘coupled’ to a listener data structure must also be structural.” Polish Op. Decl. at ¶ 146. But as I explain above in Section III.M, a POSITA would have understood that the “DHCP listener data structures” described in the ’047 Patent are merely data (i.e., information) saved by the functional “listener process.” *See supra* Section III.M (citing ’047 Patent at 34:37-40, 34:59-60, 34:60-35:9). Indeed, the ’047 Patent itself refers to a “listener” as a “process.” *See supra* Section III.M (citing ’047 Patent at 35:63-36:3 (“FIG. 17 is a flowchart of example steps of a ***Listener process*** … .”) (emphasis added), 37:16-19 (“When the ***listener process*** of FIG. 17 signals (block 862), the process determines whether the signal indicates a ‘roam’, ‘out of range’ or ‘back in range’ condition (decision block 864, 870, 874).”) (emphasis added), Fig. 17.). A POSITA would not have understood the word “listener,” as used in the ’047 Patent, to have a sufficiently definite meaning as the name for structure. Accordingly, a POSITA would not have understood the term “detector” to have a sufficiently definite meaning as a name for structure merely because the “detector” is “coupled to said listener.”

86. Dr. Polish also contends that the specification of the ’047 Patent “describes what constitutes ‘a detector’ alongside its description of what constitutes ‘a listener.’” Polish Op. Decl. at ¶ 146 (citing ’047 Patent at 34:37-42, 35:17-25, 36:37-58). However, the passages cited by Dr. Polish never refer to a “detector,” much less identify a particular structure as a “detector.” *See* ’047 Patent at 34:37-42, 35:17-25, 36:37-58. The only place in the ’047 Patent that uses the word “detector” is Claim 54, which defines the detector entirely by the function it is supposed to perform. Moreover, even Dr. Polish’s cited passage at Column 36, Lines 37-58 of the ’047 Patent refers to the associated listener as a “listener process.”



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

87. Dr. Polish also cites a single publication to contend that a POSITA "would know that the 'detector' in the '047 Patent was structural based on the state of the art." Polish Op. Decl. at ¶ 147 (citing Douglas E. Comer, Internetworking with TCP/IP Vol. 1 Principles, Protocols, and Architectures (4th ed. 2000) at 133-135, 686). But again, the extrinsic evidence cited by Dr. Polish does not support his conclusion. Nowhere do the pages of the Comer textbook cited by Dr. Polish refer to a "detector," much less identify a particular structure as a "detector." *See* Douglas E. Comer, Internetworking with TCP/IP Vol. 1 Principles, Protocols, and Architectures (4th ed. 2000) at 133-135, 686. Indeed, none of the pages of the Comer textbook provided by Dr. Polish as Exhibit 33 to his Opening Declaration use the word "detector" or sufficiently define any structures as a "detector." Thus, contrary to Dr. Polish's contention, a POSITA at the time of the '047 Patent would not have understood the word "detector," to have a sufficiently definite meaning as the name for structure.

88. Moreover, the '047 Patent specification does not disclose sufficient structure linked to the function of "learning, at least in part in response to said DHCP process, that said mobile computing device is enabled to communicate over said further network or subnetwork and, based at least in part on said learning, using said access to said further network or subnetwork to continue said secure data communications between the mobile computing device and said another computing device." Dr. Polish appears to cite the "listener data structures" of Figure 16 as alleged structures. Polish Op. Decl. at ¶ 146 (citing '047 Patent at 34:37-43, 35:17-25, 36:37-58). But, those passages describe a "listener process" (*see* '047 Patent at 36:37-58) that works in conjunction with a "listener data structure," not a particular structure of a detector that is coupled to a listener and configured to perform the recited functions. And as I explain above in Section III.M, the '047 Patent explains that a "listener data structure" is merely a set of data (i.e., information) that is updated by the functional "listener process." *See e.g.*, '047 Patent at 34:59-60. For example, the '047 Patent explains that DHCP listener data structures (as shown in



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

Figure 16) "are continually updated based on DHCP broadcast traffic" appearing on the network. *Id.* at 34:59-60. Thus, a POSITA would have understood that the "DHCP listener data structures" shown in Figure 16 are merely data updated as part of a listener function or process. A POSITA would have understood that data is not "structure" (e.g., physical structure) and data alone cannot perform the functions of (i) "learning, at least in part in response to said DHCP process, that said mobile computing device is enabled to communicate over said further network or subnetwork" and (ii) "based at least in part on said learning, using said access to said further network or subnetwork to continue said secure data communications between the mobile computing device and said another computing device." Therefore, the functions of (i) "learning, at least in part in response to said DHCP process, that said mobile computing device is enabled to communicate over said further network or subnetwork" and (ii) "based at least in part on said learning, using said access to said further network or subnetwork to continue said secure data communications between the mobile computing device and said another computing device" are not linked to any particular "structure" for a "detector" in the '047 Patent.

**O. "a DHCP listener that participates in a DHCP process with said network or subnetwork … and then reestablishing access to said network or subnetwork, said DHCP listener learning, at least in part in response to said DHCP process, that said computing device has reestablished access to said network or subnetwork" (claim 55)**

| Plaintiff's Construction | Defendants' Construction |
| --- | --- |
| Indefinite<br>(governed by 35 U.S.C. § 112(6))[8]<br>Function: "participates in a DHCP process with said network or subnetwork … and then reestablishing access to said network or subnetwork," and "learning, at least in part in response to said DHCP process, that said computing device has reestablished access to said network or subnetwork"<br>Structure: None | No construction necessary / Plain and ordinary meaning / not governed by 35 U.S.C. § 112(6) |

[8] *See supra* Section III.M, footnote 6.



CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

89. Dr. Polish contends that a POSITA would understand that the term "DHCP listener" is a structural term, not a functional term. Polish Op. Decl. at ¶ 149. I disagree with Dr. Polish. Neither the specification of the '047 Patent, nor any extrinsic evidence cited by Dr. Polish, show that a POSITA would have understood the word "DHCP listener" to have a sufficiently definite meaning as a name for structure.

90. For the "DHCP listener" term of Claim 55, Dr. Polish expressly relies on the same reasoning as for the similar "listener" term of Claim 54. Polish Op. Decl. at ¶¶ 150-151. But as I explain above in Section III.M for the "listener" term of Claim 54, a POSITA would have understood that the "DHCP listener data structures" described in the '047 Patent are merely data (i.e., information) that is updated by the functional "listener process." *See supra* Section III.M (citing '047 Patent at 34:37-40, 34:59-60, 34:60-35:9). Indeed, the '047 Patent itself refers to a "listener" as a "process." *See supra* Section III.M (citing '047 Patent at 35:63-36:3 ("FIG. 17 is a flowchart of example steps of a Listener process … ."), 37:16-19 ("When the listener process of FIG. 17 signals (block 862), the process determines whether the signal indicates a 'roam', 'out of range' or 'back in range' condition (decision block 864, 870, 874)."), Fig. 17.). Thus, for the same reasons I explain in Section III.M for the "listener" term of Claim 54, a POSITA would not have understood the term "DHCP listener," as used in the '047 Patent, to have a sufficiently definite meaning as a name for "structure."

91. Moreover, the '047 Patent specification does not disclose structure linked to the functions of "participat[ing] in a DHCP process with said network or subnetwork … and then reestablishing access to said network or subnetwork" and "learning, at least in part in response to said DHCP process, that said computing device has reestablished access to said network or subnetwork." Dr. Polish cites to the "DHCP listener data structures" of Figure 16 as alleged structure. Polish Op. Decl. at ¶ 150 (citing '047 Patent at 34:37-43, Fig. 16). But, as I explain above in Section III.M, the '047 Patent explains that a "listener data structure" is merely a set of



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

data (i.e., information) that is updated by the functional "listener process." *See e.g.*, '047 Patent at 34:59-60. For example, the '047 Patent explains that DHCP listener data structures (as shown in Figure 16) "are continually updated based on DHCP broadcast traffic" appearing on the network. *Id.* at 34:59-60. Thus, a POSITA would have understood that the "DHCP listener data structures" shown in Figure 16 are merely data updated as part of a listener function or process. A POSITA would have understood that data is not "structure" (e.g., physical structure), and data alone cannot perform the various functions recited in Claim 55 including (i) participating in a DHCP process with said further network or subnetwork, (ii) reestablishing access to said network or subnetwork, and (iii) learning, at least in part in response to said DHCP process, that said computing device has reestablished access to said network or subnetwork. Therefore, the recited functions are not linked to any particular "structure" in the '047 Patent. Indeed, as I describe above in Section III.M, the '047 Patent describes the "listener" in terms of a function or a "process." *See* '047 Patent, 35:63-36:3 ("FIG. 17 is a flowchart of example steps of a **<u>Listener process</u>** of the preferred embodiment."), Fig. 17 (illustrating a series of functional decision blocks included within the "listener" process).

### P. "data communicators that establishes access to at least one data communications network or subnetwork carrying Internet Protocol (IP) data over at least one data communication network or subnetwork" (claim 55)

| Plaintiff's Construction | Defendants' Construction |
| --- | --- |
| Indefinite | No construction necessary / Plain and ordinary meaning |

92. Claim 55 of the '047 Patent is excerpted below, with the "data communicators …" phrase emphasized:

> 55. A computing device comprising:
>
> **data communicators that establishes access to at least one data communications network or subnetwork carrying Internet**



CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

> **Protocol (IP) data over at least one data communication network or subnetwork**, and which uses said access to said network or subnetwork to establish secure data communications with another computing device; … .

’047 Patent at claim 55 (emphasis added).

93. Dr. Polish contends that the term “data communicators” has a plain and ordinary meaning and is not indefinite. Polish Op. Decl. at ¶ 154. However, Dr. Polish provides no explanation how “data communicators” establish “access to at least one data communications network or subnetwork” to carry data over a different recited “at least one data communication network or subnetwork.” The later recited “at least one data communication network or subnetwork” uses the singular form of “communication” as opposed to the plural form in the earlier recited “at least one data communications network or subnetwork.” Thus, based on the structure and words of Claim 55, the later recited “at least one data communication network or subnetwork” is distinct from the earlier recited “at least one data communications network or subnetwork.” The structure and the words of the “data communicators” phrase in Claim 55 therefore create an unresolved ambiguity because POSITA would not have understood with reasonable certainty what it means for “at least one data communications network or subnetwork” to carry data over a different “at least one data communication network or subnetwork.”

### Q. data communicators that establishes access to at least one data communications network or subnetwork carrying Internet Protocol (IP) data over at least one data communication network or subnetwork, and which uses said access to said network or subnetwork to establish secure data communications with another computing device; … wherein said data communicator informs said another computing device, based at least in part on said learning, of said reestablished access and uses said reestablished access to continue said secure data communications with said another computing device (claim 55)



CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| Indefinite<br>(governed by 35 U.S.C. § 112(6))[9]<br>Function: "establishes access to at least one data communications network or subnetwork carrying Internet Protocol (IP) data over at least one data communication network or subnetwork," and "uses said access to said network or subnetwork to establish secure data communications with another computing device" and "informs said another computing device, based at least in part on said learning, of said reestablished access and uses said reestablished access to continue said secure data communications with said another computing device"<br>Structure: None | No construction necessary / Plain and ordinary meaning / not governed by 35 U.S.C. § 112(6) |

94. Dr. Polish contends that "[t]he specification of the '047 Patent provides multiple examples demonstrating that 'data communicators' were both well-known and structural." Polish Op. Decl. at ¶ 155 (citing '047 Patent at 7:57-62, 8:4-7, 8:24-28, 11:10-15, Fig. 2). However, none of the passages cited by Dr. Polish refer to "data communicators" or a "data communicator." *See* '047 Patent at 7:57-62, 8:4-7, 8:24-28, 11:10-15, Fig. 2. Indeed, the '047 Patent does not use the term "data communicators" or "data communicator" anywhere except for in Claim 55, which defines the "data communicators" by their functional requirements. The passages from the '047 Patent cited by Dr. Polish refer to things such as "mobile interconnect …, e.g., conventional electromagnetic (e.g., radio frequency) transceivers" ('047 Patent at 7:57-62), "docking ports, network cable connectors, or the like," (*id.* at 8:4-7), "a conventional radio transceiver and/or network cable," (*id.* at 8:24-28), and "network interface drivers 200, TCP/UDP transport support 202, a transport driver interface (TDI) 204, and a socket API 206" (*id.* at 11:10-15). However, neither the '047 Patent nor Dr. Polish explain which one or more of these elements can perform the numerous functional requirements of the "data communicators" recited

[9] *See supra* Section III.M, footnote 6.



CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

in Claim 55. Thus, a POSITA would not have understood the ’047 Patent specification to describe a sufficiently definite structure for the “data communicators” recited in Claim 55.

95. Moreover, the ’047 Patent specification does not disclose sufficient structure linked to the recited functions of “establish[ing] access to at least one data communications network or subnetwork carrying Internet Protocol (IP) data over at least one data communication network or subnetwork,” and “us[ing] said access to said network or subnetwork to establish secure data communications with another computing device” and “inform[ing] said another computing device, based at least in part on said learning, of said reestablished access and us[ing] said reestablished access to continue said secure data communications with said another computing device.” Dr. Polish cites passages from the ’047 Patent which refer to components such as “mobile interconnect …, e.g., conventional electromagnetic (e.g., radio frequency) transceivers” (’047 Patent at 7:57-62), “docking ports, network cable connectors, or the like,” (*id.* at 8:4-7), “a conventional radio transceiver and/or network cable,” (*id.* at 8:24-28), and “network interface drivers 200, TCP/UDP transport support 202, a transport driver interface (TDI) 204, and a socket API 206” (*id.* at 11:10-15). *See* Polish Op. Decl. at ¶ 155. However, the ’047 Patent specification does not link any of those components to the recited functions of the “data communicators,” including: (i) “establish[ing] access to at least one data communications network or subnetwork carrying Internet Protocol (IP) data over at least one data communication network or subnetwork,” (ii) “us[ing] said access to said network or subnetwork to establish secure data communications with another computing device,” and (iii) “inform[ing] said another computing device, based at least in part on said learning, of said reestablished access and us[ing] said reestablished access to continue said secure data communications with said another computing device.” For example, there is no description in the Roaming Control section starting at Column 33, Lines 41 of the ’047 Patent specification linking any of the components cited by Dr. Polish to the various roaming control functions, much less those functions of the data communicators recited in Claim 55.



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

96. Thus, a POSITA would not have understood the “mobile interconnect,” “transceivers,” “docking ports, network cable connectors, or the like,” “conventional radio transceiver and/or network cable,” and “network interface drivers 200, TCP/UDP transport support 202, a transport driver interface (TDI) 204, and a socket API 206” cited by Dr. Polish to be linked to the specific functions of the data communicators recited in Claim 55. *See* Polish Op. Decl. at ¶ 155 (citing ’047 Patent at 7:57-62, 8:4-7, 8:24-28, 11:10-15). Indeed, Dr. Polish makes no attempt to identify specific links in the ’047 Patent between the components in the passages he cites to the recited functions of the “data communicators” in Claim 55, including: (i) “establish[ing] access to at least one data communications network or subnetwork carrying Internet Protocol (IP) data over at least one data communication network or subnetwork,” (ii) “us[ing] said access to said network or subnetwork to establish secure data communications with another computing device,” and (iii) “inform[ing] said another computing device, based at least in part on said learning, of said reestablished access and us[ing] said reestablished access to continue said secure data communications with said another computing device.”

**R. “said data communicator” (claim 55)**

| **Plaintiff’s Construction** | **Defendants’ Construction** |
|---|---|
| Indefinite | No construction necessary / Plain and ordinary meaning |

97. Claim 55 of the ’047 Patent is reproduced below, with the terms “data communicators” and “said data communicator” emphasized:

> 55. A computing device comprising:
>
> **data communicators** that establishes access to at least one data communications network or subnetwork carrying Internet Protocol (IP) data over at least one data communication network or subnetwork, and which uses said access to said network or subnetwork to establish secure data communications with another computing device;



CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

> a DHCP listener that participates in a DHCP process with said network or subnetwork upon said computing device disassociating access from said network or subnetwork and then reestablishing access to said network or subnetwork, said DHCP listener learning, at least in part in response to said DHCP process, that said computing device has reestablished access to said network or subnetwork;
>
> wherein **said data communicator** informs said another computing device, based at least in part on said learning, of said reestablished access and uses said reestablished access to continue said secure data communications with said another computing device.

'047 Patent at claim 55 (emphasis added).

98. Dr. Polish contends that the term "data communicators" has a plain and ordinary meaning and is not indefinite. Polish Op. Decl. at ¶ 154. However, Dr. Polish ignores the fact that "data communicators" are introduced in Claim 55 in the plural form, while the later "said data communicator" refers to a singular data communicator. A POSITA would not have been able to determine with reasonable certainty which of the plural "data communicators" is being further defined by the recited functional limitations of the "said data communicator."

## IV. CONCLUSION

I, Zygmunt Haas, Ph.D., do hereby declare and state, under penalty of perjury, that all statements made herein of my knowledge are true, and that all statements made on information and belief are believed to be true.

Executed on March 27, 2023.

Dr. Zygmunt J. Haas



**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Tel (206) 625-8600
Fax (206) 625-0900

# APPENDIX A

**EXHIBITS**

| # | DESCRIPTION |
|---|---|
| A | U.S. Patent No. 7,797,437 B2 Patent (Issued Sep. 14, 2010) ("the '437 Patent") |
| B | '437 Patent File History – Office Action |
| C | '437 Patent File History – Response to Office Action |
| D | '437 Patent File History – Final Office Action |
| E | '437 Patent File History – Appeal Brief |
| F | '437 Patent File History – Examiner's Answer to Appeal Brief |
| G | '437 Patent File History – Reply Brief |
| H | '437 Patent File History – Examiner's Consideration of Reply Brief |
| I | '437 Patent File History – Order Returning Appeal to the Examiner |
| J | '437 Patent File History –Notice of Allowance |
| K | U.S. Patent No. 6,981,047 B2 Patent (Issued Dec. 27, 2005) ("the '047 Patent") |
| L | William Stallings, Data and Computer Communications (Prentice-Hall, Inc. 5th ed. 1997) |
| M | W. Richard Stevens, et al., UNIX Network Programming, The Sockets Networking API, Vol. 1 (Addison-Wesley 3rd ed. 2004) |
| N | D. Bertsekas et al., *Data Networks* (Prentice Hall Inc. 2nd ed., 1992) |
| O | Andrew S. Tanenbaum, Computer Networks (3rd ed. 1996) |
| P | Douglas E. Comer, *Internetworking with TCP/IP* (Prentice Hall, Inc., 4th ed. 2000) |
| Q | Douglas E. Comer, *Internetworking with TCP/IP* (Prentice Hall, Inc., 3rd ed. 1995) |
| R | Request For Comments: 2002 (October 1996) |
| S | Newton's Telecom Dictionary (Miller Freeman, Inc. 15th ed, 1999) |
| T | Microsoft Press Computer Dictionary (Microsoft Press 3rd ed., 1997) |
| U | Newton's Telecom Dictionary (Miller Freeman, Inc. 14th ed, 1998) |
| V | Wiley Electrical and Electronics Engineering Dictionary (John Wiley & Sons, Inc., 2004) |

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing is being served on all counsel of record who consent to electronic service on this the 27th day of March, 2023.

Heidi L. Keefe
Alexandra Leeper
Reuben Chen
**COOLEY LLP**
3175 Hanover Street
Palo Alto, CA 94304
Telephone: (650) 843-5000
Facsimile: (650) 849-7400
aleeper@cooley.com
hkeefe@cooley.com
rchen@cooley.com

Orion Armon
**COOLEY LLP**
1144 15th Street, Suite 2300
Denver, CO 80202-2686
Telephone: (720) 566-4000
Facsimile: (720) 566-4099
oarmon@cooley.com

Christopher B. Durbin
**COOLEY LLP**
1700 Seventh Avenue, Suite 1900
Seattle, WA 98101-1355
Telephone: (206) 452-8700
cdurbin@cooley.com

/s/ Brett Thompsen

Stephen M. Hash (*pro hac vice*)
Kevin J. Meek (*pro hac vice*)
Syed K. Fareed (*pro hac vice*)
Samoneh Schickel (*pro hac vice*)
Brett Thompsen *(pro hac vice pending)*
**MCDERMOTT WILL & EMERY LLP**
303 Colorado Street, Suite 2200
Austin, TX 78701
Telephone: (512) 726-2600
Facsimile: (512) 532-002

shash@mwe.com
kmeek@mwe.com
sfareed@mwe.com
sschickel@mwe.com
bthompsen@mwe.com

William R. Squires III, WSBA No. 4976
**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104
Telephone: (206) 625-8600
Facsimile: (206) 625-0900
rsquires@corrcronin.com

***ATTORNEYS FOR PLAINTIFF SECTRA COMMUNICATIONS AB***