UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SECTRA COMMUNICATIONS AB et al., <br><br> Plaintiffs, <br><br> v. <br><br> ABSOLUTE SOFTWARE, INC., et al., <br><br> Defendants. | Case No. C22-353RSM <br><br> ORDER RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON COUNTS 2-6 |

## I.     INTRODUCTION

This matter comes before the Court on Defendants Absolute Software, Inc. and Mobile Sonic, Inc.'s Motion for Partial Summary Judgment. Dkt. #400. Plaintiffs Sectra Communications AB ("Sectra") and Columbitech, Inc. ("Columbitech") oppose. Dkt. #435. The Court has determined that oral argument is not necessary. Having reviewed the submissions of the parties, the Court GRANTS IN PART and DENIES IN PART the Motion.

## II.     BACKGROUND

The Court will focus only on the facts necessary for resolving the issues raised in this Motion for Partial Summary Judgment.

Although the Second Amended Complaint and briefing have been filed under seal with redacted public versions, the Court finds it to be in the public interest to issue its orders in this case without redactions. The Court has determined that the quotes below from the Second Amended Complaint and briefing can be published. Every effort has been taken to maintain the stated interests of the parties in redacting prior filings, weighed against the interests of the public and the need for the Court to discuss the issues in this case.

ORDER RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON COUNTS 2-6 - 1

The parties' briefing lacks background information, assuming the reader knows it all already.[1] The Court will thus cite to the Second Amended Complaint for background.

Mobile Sonic's predecessor, NetMotion, and Sectra's predecessor, Columbitech, were "direct competitors in… the field of mobile VPN products that provide session and application persistence technology." Dkt. #341 at 4. NetMotion's internal documents and emails indicate a "longstanding strategy" to eliminate competition from the market. *Id*. Plaintiffs allege that NetMotion had a "competitive lab" that, *inter alia*, "intentionally violated and caused its employees and third parties to violate the applicable software license agreements by acquiring and misusing the competitors' products." *Id*. at 5. NetMotion tested these products "under fabricated, unfavorable and unfair testing conditions to ensure that the competitor's products did not perform favorably compared to NetMotion's products." *Id*. NetMotion shared test results with actual and potential customers of its competitors to capture their business. *Id*. At some point NetMotion hired one of Columbitech's engineers, who is accused of transmitting confidential and proprietary information. *See id*. at 7–8. The narrative of the Second Amended Complaint indicates that this took place prior to September 2013. *See id*. at 9.

Plaintiffs allege the biased testing of Columbitech's product began in November of 2013. *See id*. False and/or misleading statements were made by NetMotion employees to a customer in April of 2018, specifically that Columbitech did not offer "traffic optimization, management, and persistence." *Id*. at 14. Internal emails allegedly indicate NetMotion knew Columbitech's product did offer those things. *Id*. The Second Amended Complaint contains many more anecdotes along these lines and includes over a thousand pages of exhibits.

---

[1] Defendants' facts section is three paragraphs long and fails to introduce the parties, the underlying technology, or the origins of this case. Plaintiffs' Response does not have a facts section. *See* Dkts. #400 and #435.

ORDER RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON COUNTS 2-6 - 2

Plaintiffs plead that NetMotion engaged in false advertising, trade libel, and commercial/business defamation by "publish[ing] in one-on-one communications with customers" a "Competitive Brief" that falsely maligned Columbitech's Mobile VPN product. Dkt. #341 at 25–26; *see also id.* at 36–37, 46–47. Discovery has shown that the brief, Dkt. #341-53, was sent to a customer "Genessee County 911" on August 19, 2014, and another customer, Brite Computers, in August of 2016. Dkt. #341 at 25–26. The allegedly false statements include, "[w]hen using the FCC speed test application Columbitech clients send data 10x slower than Mobility and receive data 30x slower," and the like. *Id*. at 26. The pleading alleges that the false statements were not accurate based on Defendants' own testing. *See id*. at 29–30. These allegations cite to attached evidence.

Plaintiffs plead that Columbitech had a valid contractual relationship and business expectancy from multiple customers including AT&T, Genesee County, and Brite Computers. *Id*. at 57. NetMotion had knowledge or should have had knowledge of these relationships. Plaintiffs allege that "[a]t least as early as 2013 and through 2018, NetMotion intentionally, willfully and improperly interfered with these relationships and business expectations by making false, misleading, and deceptive statements that made it undesirable for actual and potential customers to work with Columbitech." *Id*. at 58. Plaintiffs allege that this interference was done with the intent of getting the customers to breach their contractual relationship with Plaintiffs and was based on deception.

The Breach of Contract Claim highlights the following language from the End User License Agreement for Plaintiffs' Mobile VPN Software:

> Licensee agrees to use the Software only for Licensee's own business and is only allowed to use the Software in its entirety. The Licensee is only entitled to make one (1) additional copy of the Software for the purposes of back up and testing the Software. The

ORDER RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON COUNTS 2-6 - 3

> Licensee is not entitled to translate, adapt, modify, disassemble, decompile or reverse engineer the Software except to the extent that is otherwise provided by compulsory law. The Licensee is not granted any right other than what is specifically stated in this license agreement. Licensee may not disclose the Software except as permitted by this license agreement.

*Id.* at 65 (citing Dkt. #341-75).

Defendants share only a few key facts to support their Motion. On October 17, 2011, a customer emailed Columbitech's CEO Tobias Englund to say, "[h]ere is what NetMotion is claiming to be the key differentiators between their Mobility XE product and your SSL VPN (AirBEAM Safe)." Dkt. #400-1 at 6. Columbiatech then had its engineers write up a detailed breakdown of the NetMotion claims. One engineer found NetMotion's claim that "they are 'the only VPN to offer true Application Persistence'" to be "just slanderous and false." *Id*. at 3. This analysis apparently bounced back and forth internally at Columbitech.

In 2013, NetMotion had a consultant from Crowe Consulting purchase Columbitech's software so that it could run speed tests and compare its product to Columbitech's product under a variety of simulations. *See* Dkt. #400 at 9–10. NetMotion did not enter into the purchase agreement itself or otherwise communicate with Plaintiffs about this plan. NetMotion then drafted the above "Competitive Brief" which it allegedly shared with potential customers of the two companies between 2013 and 2018. *Id*. at 10.

This case was originally brought by Plaintiffs as a patent infringement action in the Western District of Texas in 2021. Dkt. #1. On June 12, 2023, Plaintiffs amended to include claims for false advertising, trade libel, commercial/business defamation, unfair competition under the Washington Consumer Protection Act ("CPA"), tortious interference with a business relationship, and breach of license agreement. Dkt. #186. On January 8, 2024, the Court dismissed these new claims with leave to amend. Dkt. #325. The Court found these claims

ORDER RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON COUNTS 2-6 - 4

untimely because they "clearly focus[] on bad acts prior to 2018." *Id*. at 5–6. Plaintiffs argued that the discovery rule permitted these otherwise untimely claims. However, the Court did not accept the First Amended Complaint's repeated, conclusory statement that Plaintiffs "did not know and could not have known about NetMotion's false, misleading and deceptive statements until NetMotion produced its documents in the ongoing litigation." *Id*. at 7. The Court stated:

> Plaintiffs argue that much of what Defendants did was in their secret "lab." But the actions that give rise to the causes of action—communications with Plaintiffs' potential customers—were not internal actions, and the effect on Plaintiffs' business was presumably something that Plaintiffs could have become aware of with reasonable diligence. The Court does not find that their claims *cannot* be brought, only that they are insufficiently pleaded and that Plaintiffs have done little in briefing to convince the Court that these claims can survive this affirmative defense in the future. Nevertheless, the Court cannot say that these deficiencies cannot be corrected and will grant leave to amend.
>
> Plaintiffs' attempts to apply equitable tolling and equitable estoppel share the same fate due to insufficient allegations in the Amended Complaint. Plaintiffs do not, *e.g.*, plead that Defendants took any subsequent action to prevent Plaintiffs from learning of these claims.

*Id*. at 7–8 (emphasis in original).

Plaintiffs later filed a Second Amended Complaint with more detailed claims for false advertising under the Lanham Act, trade libel, commercial/business defamation, tortious interference with a business relationship, and breach of license agreement (the CPA claim was removed). Dkt. #341. Defendants now move for summary judgment on these claims.

### III.    DISCUSSION

**A. Legal Standard for Summary Judgment**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

ORDER RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON COUNTS 2-6 - 5

R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Material facts are those which might affect the outcome of the suit under governing law. *Anderson*, 477 U.S. at 248. In ruling on summary judgment, a court does not weigh evidence to determine the truth of the matter, but "only determine[s] whether there is a genuine issue for trial." *Crane v. Conoco, Inc.*, 41 F.3d 547, 549 (9th Cir. 1994) (citing *Federal Deposit Ins. Corp. v. O'Melveny & Meyers*, 969 F.2d 744, 747 (9th Cir. 1992)).

On a motion for summary judgment, the court views the evidence and draws inferences in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Sullivan v. U.S. Dep't of the Navy*, 365 F.3d 827, 832 (9th Cir. 2004). The Court must draw all reasonable inferences in favor of the non-moving party. *See O'Melveny & Meyers*, 969 F.2d at 747, *rev'd on other grounds*, 512 U.S. 79 (1994). However, the nonmoving party must make a "sufficient showing on an essential element of her case with respect to which she has the burden of proof" to survive summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

**B. Timeliness**

Defendants again move to dismiss these claims as untimely.

No one is saying the alleged acts occurred within the statutory time limits for the above claims. Instead, Plaintiffs rely on the discovery rule, arguing they could not have brought these claims until internal records were produced in this case. *See* Dkt. #435 at 7. In that sense, it is not necessary to count the months between Defendants' actions and the filing of the claims—what the Court needs to determine is whether Plaintiffs should have discovered Defendants' bad acts in that earlier period years ago.

Under Washington law, "[t]he general rule is that 'a cause of action accrues and the statute of limitations begins to run when a party has the right to apply to a court for relief.'"

ORDER RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON COUNTS 2-6 - 6

*Shepard v. Holmes*, 185 Wn. App. 730, 739, 345 P.3d 786 (2014) (quoting *O'Neil v. Estate of Murtha*, 89 Wn. App. 67, 69-70, 947 P.2d 1252 (1997)). However, claims of fraud are "not to be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud." RCW 4.16.080(4). Additionally, in an exception to the general rule of accrual, Washington courts apply the discovery rule "where injured parties do not, or cannot, know they have been injured." *Shepard*, 185 Wn. App. at 739 (quotation omitted). Under the discovery rule, "a cause of action accrues when the plaintiff, through the exercise of due diligence, knew or should have known the basis for the cause of action." *Shepard*, 185 Wn. App. at 739 (quoting *Green v. Am. Pharm. Co.*, 86 Wn. App. 63, 66, 935 P.2d 652 (1997), *aff'd*, 136 Wn.2d 87, 960 P.2d 912 (1998)). "[W]hen a plaintiff is placed on notice by some appreciable harm occasioned by another's wrongful conduct, the plaintiff must make further diligent inquiry to ascertain the scope of the actual harm." *Aventa Learning, Inc. v. K12, Inc.*, 830 F. Supp. 2d 1083, 1095-96 (W.D. Wash. 2011). "The plaintiff is charged with what a reasonable inquiry would have discovered." *Id*. at 1096.

Viewing the evidence and drawing inferences in the light most favorable to the non-moving party, the Court cannot say as a matter of law that Plaintiffs were aware of sufficient facts in 2011 or 2013 (or prior to discovery in this case) to file the causes of action at issue now. Plaintiffs argue Defendants concealed their wrongdoing by hiring a consultant to buy Plaintiffs' software from a reseller (CDW) and by only sharing the Competitive Brief with customers confidentially, one-on-one. The evidence exists to support this argument. Defendants point to just a few events and documents to the contrary:

> First, Columbitech's account list from 2014 demonstrates that Columbitech knowingly issued license keys to its product to NetMotion….

ORDER RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON COUNTS 2-6 - 7

> Second, Mr. Crowe also testified that he informed CDW that he was buying the product "for a client" and CDW sold him a license anyway.
>
> Third, there is no evidence on the record that NetMotion ever asked AT&T or any other partner or customer not to forward or share the marketing statements that Plaintiffs allege are false and defamatory….
>
> Further, Plaintiffs fail to demonstrate why they could not have discovered external advertising materials earlier. They received statements nearly identical to the statements in the Competitive Brief in their inboxes in 2011. (Ex. 1, Tiffany Depo., Exhibit 11.) Mr. Englund also admitted that Columbitech was "suspicious" of NetMotion in 2013. (Ex. 3, Englund Depo. 170:23-172:20, 176:22-23, 177:6-7 (testifying that in 2013, Columbitech believed NetMotion had falsely told customers since 2003 that NetMotion's product complied with a National Institute of Standards and Technology encryption standard).)

Dkt. #400 at 13–14.

These examples are insufficient to demonstrate, as a matter of law, that all necessary facts of Defendants' communications with potential customers were known by Plaintiffs or knowable with reasonable diligence prior to discovery in this case.

The 2014 account list, essentially a massive spreadsheet, cannot alone demonstrate that Columbitech knowingly issued product license keys to NetMotion. Although the account list mentions NetMotion, Plaintiffs respond that the list includes "competitors, customers, integrators, prospects, partners, resellers, press, and others." Dkt. #435 at 10–11 (citing Dkt. #459-13). It appears to the Court that NetMotion is not listed as a customer or a competitor—that field is blank. Witness testimony on this is needed to clear up whatever point Defendants are trying to make here.[2]

---

[2] On Reply, Defendants argue that the account list is not "susceptible of more than one reasonable interpretation" because "nearly all [entries] are designated as customers, resellers, or partners" and "NetMotion has no designation." Dkt. #499 at 7. Defendants acknowledge that one other entry in the list is labeled "competitor." This is a prime example of improperly asking the Court to weigh evidence, determine credibility, view the facts in the

ORDER RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON COUNTS 2-6 - 8

The 2011 email has statements *similar* to the confidential Competitive Brief, but not similar enough to put Plaintiffs on notice or to make them aware of subsequent communications with Plaintiffs' potential customers. As explained in Plaintiffs' Opposition:

> First, the opinion in the email—NetMotion is the "only VPN to offer true application persistence"—relates to "NetMotion Mobility XE" and does not provide any *comparisons* between NetMotion's and Columbitech's product. Even Defendants' own witness… testified that he did not believe his own 2011 comment to be accurate because he was "trying to motivate the sales force in this case." Ex. 15 at 180:7-23 (stating that "In my -- in my opinion, the -- the key word in the original email is '*true*,' in '*true* Application Persistence,' and I can't be sure to what extent they meant 'true' in this case.").
>
> The opinion [Defendants' witness] recalled from 2011 stands in contrast to NetMotion's statements from 2013 and later that Columbitech Mobile VPN does not offer persistence **at all** (which NetMotion admitted were false). Ex. 16. The 2011 opinion that [Defendants' witness] recalled also did not make any false or disparaging comparisons as to the performance of Columbitech's product, its scalability, support for real-time traffic, etc. Dkt. 400-1. The 2011 opinion thus could not have put Columbitech on notice that it had the facts it needed for any of its disparagement claims against NetMotion. Indeed, there is no evidence that Plaintiffs suffered harm or damage from NetMotion's 2011 opinion and thus had no cause of action against NetMotion at that time.

Dkt. #435 at 11 (emphasis in original).

To determine the sufficiency of some statements against other statements and to assess the credibility of deposition testimony would essentially require the Court to "weigh evidence to determine the truth of the matter," something that is not permitted on summary judgment. Accordingly, the Court finds that a genuine dispute as to material facts preclude summary judgment dismissal of these claims based on the statute of limitations. A jury may yet find

---

light most favorable to the moving party, and drawing all reasonable inferences in favor of the moving party, contrary to the above standards for summary judgment.

ORDER RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON COUNTS 2-6 - 9

Plaintiffs were not diligent in pursuing these claims and reach a verdict in favor of Defendants on this affirmative defense.

### C. The Substance of the Claims

Defendants also move for summary judgment dismissal of these claims based on their substantive elements. The Court understands why Defendants would make these arguments—the Court has previously ruled that the allegedly bad statements to customers were close to puffery or contained facts that could easily be refuted by checking with publicly available information. That was based on the First Amended Complaint. However, viewing the evidence and drawing inferences in the light most favorable to the non-moving party, it is indeed possible that the worst of what is alleged could satisfy the elements of these claims. For example, Defendants made factual statements about testing *data*—not just that one product is faster than the other, but a specific amount faster. In their exuberance, Defendants' sales pitches said that Plaintiffs' product did not have certain features, later to be corrected. There is enough here to constitute a genuine dispute as to material facts precluding summary judgment.

Plaintiffs allege a broad range of facts to support their claims; Defendants begin this section of their Motion by pointing to statements that are open to interpretation by a jury. For example, Defendants argue that "[t]he documents also reveal that NetMotion was careful to make claims of superiority only where its product 'really [was] superior' and that NetMotion took steps to correct any potentially misleading statements before they reached customers." Dkt. #400 at 17. The superiority of one product to another, whether sufficient steps were taken to correct potentially misleading statements—these are jury questions. Defendants say they have a document showing that one of their employees reached out to AT&T "with further details that confirmed Columbitech had persistence, management and optimization—just of

ORDER RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON COUNTS 2-6 - 10

inferior quality to NetMotion's—the day after [a NetMotion employee] allegedly misstated that they did not." *Id*. Whether an employee said as alleged, or whether such was a misstatement or slander, are typically jury questions.

### 1. False Advertising

A false advertising claim under the Lanham Act requires Plaintiffs to demonstrate (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products. *Kremerman v. Open Source Steel, LLC*, No. C17-953-BAT, 2018 WL 5785441, at *16 (W.D. Wash. Nov. 5, 2018). A threshold issue on summary judgment is whether the allegedly false statements were "disseminated sufficiently" to "constitute advertising" under the Lanham Act. *Id*. at *19.

Defendants point to cases where "one-on-one" emails were insufficiently disseminated to constitute advertising. Dkt. #400 at 17–18 (citing *Kremerman, supra*; *eMove Inc. v. SMD Software Inc.*, No. CV-10-02052-PHX-JRG, 2012 WL 1379063, at *9 (D. Ariz. Apr. 20, 2012)). In Response, Plaintiffs point to evidence NetMotion communicated false information to customers in person as well, not just over email. Dkt. #435 at 16–17. Plaintiffs argue that the market, *e.g.* cell phone carriers, is small. *Id*. at 16. The Court is convinced that summary judgment cannot be granted for insufficient dissemination.

ORDER RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON COUNTS 2-6 - 11

Defendants next argue that "the allegedly false statements consist of subjective marketing representations rather than statements of fact." Dkt. #400 at 19 (citing Dkt. #400-7, Allison Report at 40–41 (detailing how statements that include words like "easier," "less than ideal," "basic," and "poor" are subjective statements of opinion)). Defendants assert that sophisticated customers would independently verify marketing statements, and here, the evidence shows that they did. *Id.* (citing Dkt. #400-7, Allison Report at ¶ 163 ("I have never witnessed a sophisticated customer forego independent testing information gathering in lieu of accepting every result propounded by a single supplier.")). When network providers like AT&T introduce products onto their networks, they "put all equipment through extensive network qualification testing." *Id.* (citing Dkt. #400-7, Allison Report at ¶ 160.)

There may well be a lot of unactionable puffery in the above statements. One key problem for Defendants, however, is the statement that Columbitech's software did not offer persistence. Defendants address this issue thusly:

> Further, when AT&T requested a comparative analysis between NetMotion and Columbitech because Sprint was targeting AT&T's customers and [NetMotion employee #1] wrote that Columbitech "did not offer the additional traffic optimization, management, and persistence that our customers depend on" (Ex. 27, ABSOLUTE_0030156), [NetMotion employee #2] clarified [NetMotion employee #1's] statements the following day (Ex. 12, ABSOLUTE_0276250), and the slide deck that AT&T ultimately produced for its marketing accurately represented Columbitech as having persistence. (Ex. 13, ABSOLUTE_0276255.) The accurate representation of Columbitech's persistence in AT&T's marketing materials suggests that either AT&T relied on NetMotion employee #2's clarification or that AT&T is "a sophisticated customer and made [its] own decisions according to technology analysis." (Ex. 5, Allison Depo. 169:20-170:9.) Plaintiffs have identified no evidence that any allegedly false statement made to AT&T influenced any action taken by AT&T, let alone any customer purchasing NetMotion through AT&T. Quidel, 2021 WL 4622504, at *2 ("[T]he nature of the audience—highly-skilled and credentialed professionals—is such that [the] representations …

ORDER RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON COUNTS 2-6 - 12

are not reasonably likely to influence their purchasing decisions even if it attracted [their] primary interest.").

Dkt. #400 at 21.  Plaintiffs respond to this by pointing out that the "following day" corrective email "does not mention the word 'persistence'" and "did not correct any of the other false statements NetMotion made (e.g., that Columbitech did not offer optimization, management, and roaming)…" Dkt. #435 at 20.

Defendants also argue that Plaintiffs have no evidence that any of the statements were false.  Plaintiffs submit the following evidence of falsity:

> NetMotion's own CTO stated in an email and repeatedly confirmed at his deposition that NetMotion's statements that Columbitech did not have persistence, optimization, roaming and management were indeed false. Ex. 16 (NetMotion's CTO stating in an email that "I wish he passed this along to us before sending it out [to AT&T]" because Columbitech does "have persistence, … optimizations, . . . roaming, . . . [and] management."); Ex. 17 at 226:14-229:7 (NetMotion CTO repeatedly testifying that NetMotion's statements were false). In addition, Dr. Shoemake—Plaintiffs' technical expert—provided 23 pages of opinion explaining why NetMotion's statements were false. Ex. 25 at ¶¶222-260.  For example, Dr. Shoemake explained that NetMotion's statements that Columbitech's software was 10x slower than Mobility while uploading and 30x slower than Mobility while downloading was false, because NetMotion's own testing data produced in this case showed that Columbitech's download/upload speeds were at par or better than NetMotion Mobility speeds. Ex. 23 at 109, n. 46. As another example, Dr. Shoemake opined that NetMotion's statement that Columbitech did not have a server configuration is false, because Mr. DeCounter who performed NetMotion's testing on Columbitech's software stated that Columbitech does have such a configuration. Ex. 23 at 100, n. 42; see also id. at 97, n. 36; 98, n. 39; 99 n. 40; 00, n. 42; 102, n.43; 103 n. 44; 108, n. 45; 109, n. 45. Mr. Englund—Columbitech's corporate representative who Defendants deposed on Columbitech's Mobile VPN—further verified that the NetMotion's statements were false. Id. at 96 n.32–109 n. 47.

Dkt. #435 at 18.

ORDER RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON COUNTS 2-6 - 13

Finally, Defendants assert that Plaintiffs cannot show actual evidence of some injury resulting from the false advertising. Dkt. #400 at 21. Instead, Plaintiffs' CEO will testify they lost customers generally—not any particular customer. *Id*. at 21–22. Defendants highlight that "Plaintiffs chose not to subpoena AT&T, despite Plaintiffs purportedly losing AT&T's business due to false advertising." *Id*. at 22. Plaintiffs respond that injury can be presumed in false advertising cases with "deliberately misleading" statements. *See* Dkt. #435 at 18–19 (citing *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1145 (9th Cir. 1997) ("In fact, for false comparative advertising claims, this circuit has held that '[p]ublication of deliberately false comparative claims gives rise to a presumption of actual deception and reliance.'"); *Campagnolo S.r.L. v. Full Speed Ahead, Inc.*, No. C08-1372 RSM, 2010 WL 1903431 (W.D. Wash. May 11, 2010)).

Viewing the evidence and drawing inferences in the light most favorable to the non-moving party, the Court cannot find that this claim fails as a matter of law for two reasons. First, although the vast majority of the advertising at issue was common puffery offered to sophisticated clients, Plaintiffs have pointed to a sufficient number of false factual statements, marketed as based on Defendants' testing, to create a dispute of material fact for the jury. The Court need not parse the sufficiency of each statement. "A specific and measurable advertisement claim of product superiority based on product testing is not puffery." *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1145 (9th Cir. 1997). Second, there is a genuine dispute as to the question of damages. Plaintiffs have presented a credible argument that Defendants' actions were deliberately misleading sufficient to trigger a presumption of injury. Plaintiffs have also presented sufficient facts for a jury to be able to conclude that at least one of their customers was persuaded to switch products based on the allegedly false statements.

ORDER RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON COUNTS 2-6 - 14

### 2. Defamation Claims

For allegedly defamatory statements, Washington courts consider the three *Dunlap* factors: (1) the context in which the statement was published, (2) the audience, and (3) the "most crucial" factor: "[a]rguments for actionability disappear when the audience members know the facts underlying an assertion and can judge the truthfulness of the allegedly defamatory statements themselves." *Life Designs Ranch*, 191 Wash. App. at 332 (citing *Dunlap v. Wayne*, 105 Wn.2d 529, 539–40 (1986)).

Defendants believe the evidence clearly shows that "NetMotion's customers would discern that NetMotion's comparative advertising statements about a competitor constituted subjective marketing." Dkt. #400 at 22. Plaintiffs respond that the marketing alluded to testing that neither the customers no Columbitech had access to. *See* Dkt. #435 at 22.

As stated above, Defendants are more than able to point to statements that are mere puffery. Some of the statements were clearly factual and not mere opinion. Furthermore, NetMotion has a witness who will testify that one of these customers "had no resources to perform their own independent technical analysis or the resources to verify any competitive analysis they received from suppliers, such as NetMotion." *Id*.

Although the Court remains skeptical of the inability of the sophisticated customers at issue here to view the testing information with a grain of salt, the Court is not the fact-finder. Viewing the evidence and drawing inferences in the light most favorable to the non-moving party, the Court cannot find that this claim fails as a matter of law.

### 3. Tortious Interference with Business Expectancy

Tortious interference requires: "(1) [T]he existence of a valid contractual relationship or business expectancy; (2) that defendants had knowledge of that relationship; (3) an intentional

ORDER RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON COUNTS 2-6 - 15

interference inducing or causing a breach or termination of the relationship or expectancy; (4) that defendants interfered for an improper purpose or used improper means; and (5) resultant damage." *Tacoma Auto Mall, Inc. v. Nissan N. Am., Inc.*, 169 Wash. App. 111, 132 (2012) (citation omitted).

Defendants' Motion does not really challenge the notion that *some* evidence supporting these elements exists in this case. Instead, Defendants repeatedly attack the sufficiency of that evidence, essentially asking the Court to find that no reasonable juror could find in favor of Plaintiffs as a matter of law. The Court is convinced that there is sufficient evidence here of the first four elements, for at least certain clients. *See, e.g.,* Dkt. #435 at 22–23. That there is other evidence showing that some customers may have chosen NetMotion over Columbitech "for legitimate competitive reasons," *see* Dkt. #499 at 14, simply invites a fact-finder to weigh evidence. The Court will not do so on summary judgment.

### 4. Breach of Contract

Unambiguous contract terms are interpreted as a question of law. *Timeline, Inc. v. Proclarity Corp.*, No. C05-1013JLR, 2007 WL 1574069, at *4 (W.D. Wash. May 29, 2007) (interpreting undefined contract terms by "their 'plain, ordinary, and popular' meaning") (citation omitted); *CBS, Inc. v. Am. Soc'y of Composers, Authors & Publishers*, 714 N.Y.S.2d 44, 45 (2000) ("plain language of the agreement" allowed for summary judgment without any "need to resort to extrinsic evidence").

The allegations here are that Defendants breached the above terms in the EULA by running "fabricated tests" and "perform[ing]… comparisons with other products." Dkt. #341 at 66. Testimony will show that NetMotion "introduced [] things like packet loss, latency, loss of cell signal. . . ." into the Columbitech product when testing." *Id.* (citing a deponent saying "as I

ORDER RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON COUNTS 2-6 - 16

recall, we had an environment where we could control the latency and the packet loss in a controlled set of environments, and we would kind of ratchet up the dials, if you would, and run tests and then change environment, and then run tests and change environment."). Plaintiffs also allege that the EULA was breached when Defendants forwarded copies of the software. *Id*.

Defendants argue that there is no evidence of "forwarding," and some testimony to the contrary. Dkt. #400 at 26. The Court agrees.

This cause of action thus rests solely on whether Defendants' *testing* of the software constitute a breach of the EULA as a matter of law. There does not appear to be a genuine dispute of material fact here, and the Court can interpret the unambiguous language of the EULA as a matter of law. The EULA permits testing of the software. It does not permit translating, adapting, modifying, disassembling, decompiling or reverse engineering the software. Defendants ran the software through some artificial environments. External factors were changed to see how the software would adapt. There is no evidence the software was modified in any of the ways listed above, which involve internal changes. The external factors might have been unreasonable, the results might be misleading or miscommunicated in the Competitive Brief—as may be argued at trial. But the Court finds, as a matter of law, that Plaintiffs have failed to demonstrate that such testing could constitute a breach of the EULA, an essential element of their claim. Dismissal on summary judgment is therefore warranted.

### D. Available Damages

Plaintiffs will apparently present no evidence in this case showing actual damages—loss of revenue, etc. Instead, they seek damages under unjust enrichment. The parties appear to agree that such damages are available for Plaintiff's second claim, false advertising, although

ORDER RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON COUNTS 2-6 - 17

Defendants argue that Plaintiffs must show "deliberate falsity." Dkt. #499 at 16 (citing *Campagnolo S.r.L. v. Full Speed Ahead, Inc.*, No. C08-1372 RSM, 2010 WL 1903431, at *10 (W.D. Wash. May 11, 2010)). The Court finds that a genuine dispute of material fact exists as to the deliberateness of the alleged false statements and that this claim may otherwise proceed.

A defamation plaintiff must prove four elements: (1) falsity, (2) an unprivileged communication, (3) fault, and (4) damages. *Maison de France v. Mais Oui!*, 126 Wn. App. 34, 43-44 (2005). Typically, damages are shown via evidence of actual damages—economic damage, damage to reputation, emotional distress, loss of sales, etc. *See id*. at 51-52. However, "where no matters of public concern are involved, presumed damages to a private plaintiff for defamation without proof of actual malice may be available." *Id*. at 54. For a claim of trade libel/defamation per se (Counts 3 and 4), "[i]f the plaintiff shows that the defendant's statements constituted defamation per se, the court presumes that the plaintiff was damaged, and the jury, without any further data, is at liberty to assess substantial damages, upon the assumption that the plaintiff's reputation has been injured and his feelings wounded." *Universal Life Church Monastery Storehouse v. King*, 2023 WL 1928169 (W.D. Wash. Feb. 10, 2023). A statement is defamatory per se if it "(1) exposes a living person to hatred, contempt, ridicule or obloquy, to deprive him of the benefit of public confidence or social intercourse, or (2) injures him in his business, trade, profession or office." *Id*. Defendants do not adequately address this concept. The Court finds that the lack of evidence of actual damages does not by itself doom these claims.

As for the remaining claims, it is clear that unjust enrichment damages are not available when other legal remedies exist.

ORDER RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON COUNTS 2-6 - 18

A plaintiff establishing tortious interference with a business relationship (Count 5) can recover damages for (1) "pecuniary loss of the benefits of the contract," (2) "consequential losses for which the interference is a legal cause," and (3) "emotional distress or actual harm to reputation, if they are reasonably to be expected to result from the interference." *Mut. of Enumclaw Ins. Co. v. Gregg Roofing, Inc.*, 178 Wash. App. 702, 714 (2013). To recover damages, the business must provide evidence of quantifiable, economic harm such as "decreased income, diminished value of the business … or a reduction of the business's goodwill." *Id*. at 723. The Court finds that the absence of such evidence is fatal to this claim and will dismiss it on summary judgment as a matter of law.

The EULA is governed by New York state law. Dkt. #341-75 at 3. Under New York law, the theory of unjust enrichment may be employed only in the circumstance of a quasi-contract claim. *See Beth Israel Medical Center v. Horizon Blue Cross and Blue Shield of New Jersey, Inc.*, 448 F.3d 573, 586 (2d Cir. 2006). "It is an obligation the law creates [as an equitable remedy] in the absence of any agreement." *Id*. at 586-87 (citation omitted). Therefore, where there is an enforceable contract, an equitable remedy under a quasi-contract theory is not available. *See R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 60 (2d Cir. 1997); *Beth Israel Medical Center*, 448 F.3d at 587. The Court finds that Plaintiffs cannot proceed with the EULA contract claim with evidence of unjust enrichment and the absence of actual damages evidence is fatal to this claim. This claim will be dismissed on summary judgment as a matter of law.

## IV.   CONCLUSION

Having reviewed the relevant briefing and the remainder of the record, the Court hereby finds and ORDERS that Defendants' Motion for Partial Summary Judgment, Dkt. #400, is

ORDER RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON COUNTS 2-6 - 19

GRANTED IN PART and DENIED IN PART as set forth above. Plaintiffs' claims for tortious interference with a business relationship and breach of the license agreement are DISMISSED.

DATED this 28th day of October, 2024.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE